

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-14-00170-CV

**ANDERSON ENERGY CORPORATION** and Ellersly, Inc.,
Appellants/Cross-Appellees

v.

**DOMINION OKLAHOMA TEXAS EXPLORATION & PRODUCTION, INC.**
and HighMount Exploration & Production Texas, LLC,
Appellees/Cross-Appellants

From the 112th Judicial District Court, Sutton County, Texas
Trial Court No. 0005419
Honorable Pedro Gomez, Judge Presiding

Opinion by:  Rebeca C. Martinez, Justice

Sitting:  Rebeca C. Martinez, Justice
Patricia O. Alvarez, Justice
Luz Elena D. Chapa, Justice

Delivered and Filed:  June 30, 2015

REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART;
AFFIRMED IN PART

Anderson Energy Corporation and Ellersly, Inc. (collectively, "Anderson") appeal the

summary judgment entered in favor of Dominion Oklahoma Texas Exploration & Production, Inc.

and HighMount Exploration & Production Texas, LLC (collectively, "HighMount"). Anderson's

appeal presents two issues: (1) whether as a matter of law the term "Contract Area" in the joint

operating agreement is limited to the "lands, oil and gas leasehold interests, and oil and gas

interests" owned by the original parties on April 1, 1980 when they executed the joint operating

agreement; and (2) if the agreement applies to interests acquired after 1980, whether the joint operating agreement is terminable at will due to the absence of a specific duration. HighMount also brings a cross-appeal, conditioned on reversal of the summary judgment, asserting that the trial court erred in denying summary judgment on its affirmative defenses to Anderson's lawsuit. We reverse the portion of the trial court's judgment as to the meaning of the Contract Area and render judgment declaring that the Contract Area includes interests acquired by the parties and their successors after the execution date of the joint operating agreement. We reverse the portion of the judgment as to the duration of the joint operating agreement, and render judgment that the agreement is effective for a reasonable time; we remand to the trial court for a determination of the factual issue of what period constitutes a reasonable term. Finally, we affirm the trial court's denial of summary judgment on HighMount's affirmative defenses, and remand to the trial court for further proceedings consistent with our opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 7, 1980, William Perlman and Sun Gas Company entered into a letter agreement (the "Letter Agreement") pursuant to which Perlman agreed to sell Sun Gas an undivided 50% interest in certain oil, gas, and mineral leases and wells located in Edwards, Crockett, Sutton, and Terrell Counties, Texas. Specifically, in exchange for its payment of $6,000,000, Sun Gas purchased an undivided one-half of Perlman's right, title, and interest in 37 existing wells, together with the leasehold estates attributable to such wells, and the right to participate in the drilling program outlined in the Letter Agreement. As to the latter, the Letter Agreement provided, "[b]y participating in the drilling program Sun will earn an undivided fifty percent (50%) interest in the wells and fifty percent (50%) of your [Perlman's] leasehold interests lying within the areas outlined on the attached plats, hereinafter collectively referred to as 'Such Properties . . . .'" Sun Gas agreed to invest an additional $1.7 million over time under the drilling plan. Section 6 of the

Letter Agreement stated in part, "[t]his proposal extends to the whole of your interests in Such Properties . . . ." In Section 2, the Letter Agreement stated that Perlman would deliver the assignments of a one-half interest in the 37 wells, their equipment, and their leasehold estates at closing, but that "[a]ssignments of the balance of the leasehold interests to be acquired hereunder shall be made from time to time as earned and required." In section 5 of the Letter Agreement, Perlman represented that he "own[s] leasehold interests within the outlined areas on the attached plats covering at least 62,000 net acres . . . ." The Letter Agreement stated that all operations were to be conducted under the terms of an operating agreement which would govern the rights and obligations of the parties.

The joint operating agreement between the operator Perlman and Sun Gas referenced by and incorporated in the Letter Agreement became effective on April 1, 1980 (the "JOA"). It governs the exploration, development, and operation of mineral interests within the "Contract Area." The Contract Area is defined in Article I as "all of the lands, oil and gas leasehold interests, and oil and gas interests intended to be developed and operated" under the agreement as described in Exhibit A attached to the JOA. Exhibit A identifies the "land and leases subject to [the] Agreement" as "all interest of [the] parties in the land located within the areas outlined on the attached plats marked Exhibits A-1 through A-8." Eight maps, or plats, are attached to Exhibit A. Each map shows an area outlined with hash marks, as well as smaller areas identified by dots both inside and outside the hash-marked area; each map also contains the notation "AMI" and the name of the area, e.g., "Marjorie Canon Brown Area, A.M.I." The JOA also contains a preprinted preferential right to purchase ("PRP") provision governing any sales of the parties' interests subject to the JOA, and a typewritten area of mutual interest ("AMI") provision added under Article XV(B) governing future acquisitions of interests subject to the JOA. Article XIII of the

JOA contains two preprinted options designating the term of the agreement, but the parties did not select either option.

Following several assignments during the ensuing years, Anderson[1] became the successor in interest to Sun Gas's original interest, while Dominion Oklahoma Texas Exploration & Production, Inc. ("DOTEPI") became the successor in interest to Perlman's original interest. DOTEPI sold all of its interest to HighMount on July 31, 2007.

In July 2007, before the sale from DOTEPI to HighMount was completed, Anderson filed a breach of contract suit against DOTEPI and other Dominion entities in the chain of title. Anderson alleged that DOTEPI and the other Dominion entities[2] breached the JOA during the preceding years by acquiring lease, mineral, or fee interests in land included within the Contract Area and drilling more than one hundred gas wells within the AMI, without notifying Anderson and providing it the opportunity to purchase a proportional interest. Anderson added HighMount as a defendant in the lawsuit after it purchased DOTEPI's interest, asserting that the sale constituted a breach of the PRP provision of the JOA. Anderson also alleged that HighMount violated the AMI provision after its purchase by acquiring additional oil and gas interests subject to the JOA and drilling wells within the AMI without providing Anderson notice and an opportunity to purchase a proportionate interest. Anderson's causes of action in its live petition[3] are breach of contract, specific performance, tortious interference with a contract, and a request for an accounting of its share of the proceeds from the interests to which it claims to be entitled under the JOA. Each of Anderson's claims arises out of the PRP and AMI provisions of the JOA.

---

[1] Anderson sold half its interest to Ellersly, Inc. in 1996.

[2] Anderson ultimately nonsuited all the Dominion entities except DOTEPI.

[3] The parties agree that Anderson's Fourth Amended Petition is the live petition.

The parties filed summary judgment motions on various issues in the case. Anderson obtained a partial summary judgment ruling that the PRP and AMI provisions of the JOA are real covenants that run with the land and thus bind the real property interests held by Anderson and HighMount as successors of Sun Gas and Perlman. *See Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 910-11 (Tex. 1982).

Defendant HighMount obtained a summary judgment ruling that, as a matter of law, the scope of the Contract Area subject to the JOA is limited to the original interests owned by Perlman and Sun Gas on April 1, 1980, and that the JOA is terminable at will because no specific term was selected by the parties. In the trial court's order granting HighMount's summary judgment motion as to the duration of the JOA, the court expressly stated that "the issue of if and when the Joint Operating Agreement . . . terminated is hereby RESERVED FOR TRIAL." HighMount also moved for summary judgment on its affirmative defenses of Statute of Frauds, waiver, and laches, but did not prevail.

In view of the trial court's summary judgment order concerning the meaning of the term Contract Area, the parties entered into an agreed stipulation that Anderson "do[es] not have a claim to damages based upon the Contract Area as determined by the Court . . . because there are no leases or wells under the Court's definition of the Contract Area that are subject to any of the Plaintiffs' claims for damages." The trial court subsequently entered a final judgment incorporating its prior summary judgment orders and ruling that Anderson take nothing. Anderson now appeals.

## MAIN APPEAL

As noted above, Anderson challenges the trial court's summary judgment conclusions that, as a matter of law: (1) the Contract Area subject to the JOA covers only the parties' interests owned on the April 1, 1980 execution date, and thus does not include interests subsequently acquired by

the parties and their successors; and (2) the JOA is terminable at will because no duration was selected by the parties. We review the grant or denial of a summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). A traditional summary judgment is proper only when the movant establishes that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law on the issues expressly set out in the motion. TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). In reviewing a summary judgment, we consider all the evidence in the light most favorable to the non-movant, indulging every reasonable inference in favor of the non-movant and resolving any doubts against the motion. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756 (Tex. 2007).

It is undisputed that HighMount and its predecessors acquired additional oil and gas interests/leases and subsequently drilled wells within the area of land outlined on the Exhibit A maps without first notifying Anderson or offering it the opportunity to participate. It is also undisputed that Anderson did not receive notice or an opportunity to purchase DOTEPI's interest under the JOA before DOTEPI sold all its interest to HighMount. Therefore, the dispute between the parties turns on the scope of the Contract Area and, to a lesser extent, whether the JOA was still in effect when these post-1980 acquisitions and sales occurred.

### *(1) Meaning of "Contract Area" Subject to the JOA*

The parties present various arguments in favor of their two competing interpretations of the term "Contract Area" in the JOA—with the crux of the dispute being whether its scope extends to future acquisitions of interests as Anderson contends, or is limited to the original interests owned by the parties' predecessors on April 1, 1980, as the trial court ruled and HighMount asserts. Anderson bases its argument that future acquisitions are covered within the broad language used in the "Contract Area" definition referring to "all of the lands" described in Exhibit A, and on

Exhibit A's equally broad description of such lands by referring to "all interest of the parties in the land located within the areas outlined" on the eight maps. Anderson also stresses the importance of the parties' addition of a typewritten AMI provision which Anderson asserts proves a clear intent that the JOA would apply to interests acquired after 1980. HighMount bases its argument that the Contract Area is limited to the predecessors' original interests on the present tense language used in the JOA's "WHEREAS" recital and the definitions of "oil and gas leases" and "oil and gas interests" stating that the parties "are owners" of the oil and gas leases and interests intended to be developed under the JOA. HighMount contends the AMI provision does not show the parties intended the JOA to cover future acquisitions because the parties did not use the phrase "area of mutual interest" and did not expressly refer to any future acquisitions in Exhibit A.

*Applicable Law.* The construction of an unambiguous contract is a question of law, which we review de novo. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650-51 (Tex. 1999); *PNP Petroleum I, LP v. Taylor*, 438 S.W.3d 723, 735 (Tex. App.—San Antonio 2014, pet. denied). If a contract as worded can be given a clear and definite legal meaning, then it is not ambiguous and the court will construe the contract as a matter of law. *Gilbert Tex. Contr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 133 (Tex. 2010); *see also Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996) ("[A]mbiguity does not arise simply because the parties advance conflicting interpretations of the contract."). In conducting a de novo review, we exercise our own judgment and give no deference to the trial court's decision. *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998). Our primary duty when construing an unambiguous contract is to ascertain the parties' true intent as expressed within the "four corners" of the contract. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). In applying the "four corners" rule, we do not look at isolated terms out of context, but consider the plain language of the entire agreement, the interaction between each of its provisions, and seek

to harmonize and give effect to all its provisions. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005); *Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 789 (Tex. 1995). "We give the language its plain, grammatical meaning unless doing so would clearly defeat the parties' intentions." *Tana Oil & Gas Corp. v. Cernosek*, 188 S.W.3d 354, 359 (Tex. App.—Austin 2006, pet. denied).

Here, neither party argues that the JOA is ambiguous, and we independently conclude that it is unambiguous. Therefore, we will construe the meaning of the term Contract Area as a matter of law by looking to the plain language used by the parties within the "four corners" of the JOA, attempting to harmonize and give effect to all of its parts in order to ascertain the parties' true intention. *See Valence*, 164 S.W.3d at 662; *Forbau*, 876 S.W.2d at 133.

*Analysis.* Perlman and Sun Gas used the 1977 AAPL Model Form Operating Agreement as the basis for the JOA they signed on April 1, 1980. The JOA form begins with the following preprinted recital,

> WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided . . .

Article I of the JOA contains several preprinted form definitions. It defines the "Contract Area" as "all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement" and states that "such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit A." The terms "oil and gas lease," "lease," and "leasehold" are defined as "the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement." The term "oil and gas interests" is defined as "unleased fee and mineral interests in tracts of land lying with the Contract Area which are owned by parties to this agreement."

Article II of the JOA states that Exhibit A shall include, among other information, the "(1) Identification of lands subject to agreement," "(3) Percentages or fractional interests of parties to this agreement," and "(4) Oil and gas leases and or oil and gas interests subject to this agreement." Article II also provides that if any part of an exhibit (except the unrelated Exhibit G) is inconsistent with any part of the body of the agreement, the provisions in the body of the agreement control.

Exhibit A is a typewritten document prepared by the parties and attached to the JOA. It provides as follows:

(Contract Area)
Land and Leases Subject to Agreement

All interest of parties in the land located within the areas outlined on the
attached plats marked Exhibits A-1 through A-8.

Interest of the Parties

William Perlman      ½
Sun Gas Company     ½

Provided; however, the costs and expenses of the initial wells shall be borne in accordance with the letter agreement dated March 7, 1980 to which this Operating Agreement is attached.
…

Initial wells:

To be mutually agreed to by the parties on or before April 1, 1980.

The eight maps attached to Exhibit A appear in the form shown below:



The body of the JOA makes separate references under Article VI, titled "Drilling and Development," to "initial wells" (section A) whose development is governed by the Letter Agreement's drilling plan and Exhibit A, and to "subsequent operations" (section B) for which notice of the proposed operation and an opportunity to elect to participate must be given to the other parties. Article VII, titled "Expenditures and Liability of Parties," also makes distinctions between "initial wells" and "all other wells" under section D concerning limitation of the parties' expenditures.

As previously noted, the JOA also contains a preprinted preferential right to purchase provision ("PRP") under Article VIII(G) which requires any party desiring to sell all or part of its

interest in the Contract Area to first provide the other parties with notice and the option to purchase it on the same terms. The parties also added a typewritten "area of mutual interest" provision ("AMI")[4] under Article XV(B) of the form, titled "Other Provisions," which states in relevant part,

> In the event any party to this contract shall, during the life of this agreement, acquire any leasehold, mineral or fee interest in any of the land included within the Contract Area, the party acquiring such interest shall give notice of such acquisition to the other parties . . . and the parties so notified shall have a period of thirty (30) days . . . within which to elect to purchase an undivided interest in the interest so acquired in the same proportion as such parties' interest is set out herein.

We construe the Contract Area subject to the JOA not by isolating individual words but by considering the language used in the context of the JOA as a whole—including the AMI provision. The most telling indicator of the parties' intent with regard to future acquisitions is their insertion of a typewritten "area of mutual interest," or AMI, provision under Article XV of the model form agreement; the parties agree that the model form does not include an AMI as a standard provision.

The Texas Supreme Court has explained that, "[i]n an area of mutual interest agreement, the parties attempt to describe a geographic area within which they agree to share certain additional leases acquired by any of them in the future." *Westland*, 637 S.W.2d at 905 (explaining that "[t]his necessarily contemplates that oil and gas leasehold interests will be conveyed" in the future). A joint operating agreement by its nature is intended to govern the parties' acquisitions, development and operation of mineral interests beyond the date of its execution. *See Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 344 n.1 (Tex. 2006) (discussing function of an oil and gas operating agreement). HighMount argues the AMI provision does not include the phrase "area of mutual interest" or the notation "AMI," and is not a "typical" AMI provision. Although it does not bear the title AMI or use the magic words, the substance of the provision does constitute an

---

[4] Even though HighMount questions whether this section actually constitutes an area of mutual interest provision, the parties refer to the provision as an AMI in their briefs and we do the same for the sake of convenience.

"area of mutual interest" obligation agreed to by the original parties to the JOA. *Cf. Westland*, 637 S.W.2d at 905 (quoting the AMI language which made any party's or assign's future acquisition of leasehold interests affecting "any of the lands covered by said farmout agreement" subject to the terms and provisions of the agreement). Further, the notation "AMI" is present on each of the eight maps attached to Exhibit A. The parties' addition of the AMI provision shows they contemplated future acquisitions of "leasehold, mineral or fee interest[s] in any of the land included within the Contract Area . . . ."

As quoted above, the preprinted language used to define the Contract Area states that it shall include all of (1) the lands, (2) oil and gas leasehold interests, and (3) oil and gas interests which are intended to be developed and operated under the agreement. The inclusion of "the lands," along with the terms "oil and gas leasehold interests" and "oil and gas interests," suggests that the Contract Area includes "lands . . . intended to be developed" as well as oil and gas leases and mineral interests. We disagree that the present tense form language "are owners" in the WHEREAS recital and "are owned" in the definitions of "oil and gas leasehold interests" and "oil and gas interests" limits the JOA's scope to only those leases and mineral interests owned by the original parties on April 1, 1980. Such an interpretation of the preprinted language ignores and gives no effect to the typewritten AMI provision which the parties expressly inserted into the model form agreement. The present tense language may therefore be reasonably read as inclusive of the interests that the parties subsequently acquire, which then become interests that "are owned" by the parties under the JOA.

The key to the meaning of the Contract Area is Exhibit A, which was typewritten by the parties. Exhibit A's function is to specifically describe the "lands, oil and gas leasehold interests and oil and gas interests" which the parties intended to develop and operate under the JOA for oil and gas purposes. Article II of the JOA explains that one of the functions of Exhibit A is to identify

the lands subject to the JOA, and another function is to identify the oil and gas leases and oil and gas interests subject to the JOA. As set forth above, Exhibit A designates the "Contract Area" as the "Land and Leases Subject to [the] Agreement" and the "Initial Wells." The "Initial Wells" are not listed, but are defined as "[t]o be mutually agreed to by the parties on or before April 1, 1980," with their costs and expenses to be borne in accordance with the Letter Agreement. The "Initial Wells" are listed on Schedule A to the Letter Agreement. Exhibit A's reference to "Land *and* Leases" indicates the parties' intention that the Contract Area include *unleased* land in addition to the existing wells and leases. The "Land and Leases" subject to the JOA are further defined as all of the parties' interest in "the land located within the areas outlined on the attached plats marked Exhibits A-1 through A-8." As shown above, the eight maps each depict a named area of platted land with a large irregular section outlined by hash marks and smaller square tracts marked by dots or stippling; there are stippled tracts both inside and outside the large area outlined by hash marks. Each map is also marked "A.M.I." Viewing the images of these maps in the context of Exhibit A's language and the inclusion of an AMI provision, a reasonable construction is that the parties depicted the "Land and Leases" subject to the JOA in geographic terms by using hash marks to enclose the areas of land comprising the Contract Area.

The parties represent that no Texas case has addressed this precise issue, and we have found none. In their briefs and at oral argument, the parties discussed three cases from other jurisdictions that they contend are helpful. The three cases from Kansas, Colorado, and Louisiana interpret the meaning of "Contract Area" under the model form joint operating agreement (the term "Unit Area" is used in the 1956 form). However, none of the cases involved operating agreements with an AMI provision—a significant difference from this case.

Although the Kansas, Colorado, and Louisiana cases are all distinguishable based on the absence of an AMI provision inserted by the parties, the cases do contain some interesting points.

For example, in *Amoco Prod. Co. v. Wilson*, 976 P.2d 941 (Kan. 1999), the Kansas Supreme Court rejected the same argument made here by HighMount that the present tense language in the "WHEREAS clause" stating the parties "are owners" of the leases and mineral interests identified in Exhibit A limited the operating agreement to leases and interests owned when the agreement was executed, reasoning that the WHEREAS recital itself refers to the more specific Exhibit A. *Id.* at 953. In holding that the parties intended the operating agreement to cover future acquisitions within the "Unit Area," the court reasoned that because the meaning of the "Unit Area" was defined by reference to the typewritten Exhibit A, the "wording of Exhibit A [is] of utmost importance" and "compels the construction of the agreement" that the court found. *Id.* at 954. Similarly, in *Kincaid v. W. Operating Co.*, 890 P.2d 249 (Colo. App. 1994), the Colorado court also held the parties intended the operating agreement to include all interests acquired within a specific geographic area, including those interests acquired after the agreement was executed. *Id.* at 252 (considering extrinsic evidence because Exhibit A was ambiguous). The Colorado court also noted that it was standard practice in the oil and gas industry at the time for parties to enter into operating agreements regarding leases to be acquired in the future. *Id.* at 253 (noting "[t]herefore, there was no strong policy reason not to construe the contract as including later acquired oil and gas interests and leases such as the Smith Interests."). Finally, in *Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC*, 112 So.3d 187 (La. 2013), the Louisiana Supreme Court held that the operating agreement's preprinted language limited Exhibit A's definition of the Contract Area to only leases and unleased mineral interests owned by the parties at the time the agreement was executed. *Id.* at 193-94. Although the court reasoned that the present tense "are owners" language in the form's preprinted WHEREAS recital and definition of "oil and gas interests" would be disregarded by an interpretation of the agreement as extending to future acquisitions, the court emphasized that "the parties could have expressly agreed that the JOA

would apply to future leases by including an Area of Mutual Interest provision ("AMI")," but did not do so. *Id.* at 195 (defining an AMI provision as an agreement between parties to a joint operating agreement "by which the parties attempt to describe a geographical area within which they agree to share certain additional leases or other interests acquired by any of them in the future").

Harmonizing all of the above described provisions of the JOA in this case, and giving effect to all its parts according to the plain meaning of the language used, we conclude that Perlman and Sun Gas intended that interests acquired in the future by them, or by their successors, within the lands outlined by the hash marks on Exhibit A's eight maps, i.e., within the Contract Area, are subject to the JOA. Based on this conclusion, we now turn to Anderson's second issue on appeal involving the duration of the JOA.

### (2) Duration of the JOA

Having held that future interests acquired within the Contract Area are subject to the JOA, we must reach the issue of whether the JOA is terminable at will, as the trial court ruled, or is effective for a "reasonable time" as Anderson asserts. As noted, Article XIII of the JOA contains two preprinted options to designate its duration, with Option No. 1 providing a term based on the continuation of any lease, and Option No. 2 providing a term based on the continuation of production.[5] The original parties did not select either of the term options, and the trial court ruled that, as a matter of law, the JOA is terminable at will.

---

[5] Option No. 1 provides a term based on, "So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise, and or so long as oil and/or gas production continues from any lease or oil and gas interest." Option No. 2 states, "In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling or reworking a well or wells hereunder, this agreement shall continue in force until such

HighMount argues in support of the court's ruling that, generally, if a contract contemplates continuing performance and lacks a specified duration it is considered to be terminable at will by either party. *See Clear Lake City Water Auth. v. Clear Lake Utils., Co.*, 549 S.W.2d 385, 390 (Tex. 1977). HighMount does not cite any case from Texas or any other state in which an oil and gas operating agreement without a specified duration was held to be "terminable at will," and we have found none. Anderson argues that the JOA cannot be terminable at will because its provisions, particularly the AMI and PRP provisions, convey real property interests and constitute covenants running with the land which cannot be unilaterally terminated by one party. *See Westland*, 637 S.W.2d at 910-11. Anderson also asserts that no Texas court has ever held a joint operating agreement to be terminable at will, and that an "at will" duration is not practical, fair, or customary in the oil and gas industry due to the millions of dollars expended in oil and gas operations under joint operating agreements. Anderson asserts that a term extending for a "reasonable time" must be implied into the JOA. *See Hall v. Hall*, 158 Tex. 95, 308 S.W.2d 12, 15 (1957) ("in contracts of the general type . . . a term of reasonable duration may be implied, with the result that they are not void for lack of an essential provision and are not terminable at will").

We agree with Anderson. Based on the nature of a joint operating agreement, and particularly the nature of AMI and PRP provisions as real property covenants running with the land,[6] we conclude that a reasonable term should be implied into the JOA. *See Seagull Energy*, 207 S.W.3d at 344 n.1 (stating an operating agreement "is a contract typical to the oil and gas industry whose function is to designate an 'operator, describe the scope of the operator's authority, provide for the allocation of costs and production among the parties to the agreement, and provide

---

operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein." Option No. 2 then contains a provision addressing the drilling of dry holes.

[6] HighMount did not appeal this ruling by the trial court.

for recourse among the parties if one or more default in their obligations'"); *EOG Res.*, *Inc. v. Killam Oil Co., Ltd.*, 239 S.W.3d 293, 298 (Tex. App.—San Antonio 2007, pet. denied) (discussing the function of an oil and gas operating agreement in connection with its term). We have previously stated in a case construing an oil and gas operating agreement that, "[w]e construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and we avoid when possible a construction that is unreasonable, inequitable, and oppressive." *EOG Res.*, 239 S.W.3d at 298 (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)). In order to effectuate the purposes of the JOA as a whole, particularly the AMI and PRP provisions, it is necessary and appropriate to imply a reasonable term as the duration of the JOA. *See HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 888 (Tex. 1998) (court may imply a term into a contract when necessary to effectuate the purposes of the contract as a whole); *see also O'Farrill Avila v. Gonzalez*, 974 S.W.2d 237, 244 (Tex. App.—San Antonio 1998, pet. denied) (same). Further, it is undisputed that "hundreds of wells have been drilled" in the Contract Area since the JOA became effective on April 1, 1980. Courts frequently imply a reasonable time in a contract without an express duration where the agreement contemplates substantial expenditures or other investments in accordance with performance. *See O'Farrill Avila*, 974 S.W.2d at 244-45.

HighMount argues in the alternative that, even if a reasonable term is implied into the JOA, such reasonable time lasted only as long as the parties jointly owned or operated the property, and any such joint operations have long since ended; therefore, the JOA has already terminated. We disagree that the time period constituting a reasonable term has been resolved as a matter of law. The period of time that is a "reasonable time" for performance of a contract without a specified term is a question of fact to be determined by the circumstances of the parties and the subject matter of the contract. *Hall*, 308 S.W.2d at 16-17; *O'Farrill Avila*, 974 S.W.2d at 245; *see also*

- 17 -

*WesternGeco, L.L.C. v. Input/Output, Inc.*, 246 S.W.3d 776, 784 n.6 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (if a court implies a "reasonable time" as the duration of an agreement, the determination of the length of the "reasonable time" is a question of fact based on the circumstances surrounding the making of the agreement, the parties' situations when they entered the agreement, and the subject matter of the agreement). Further, as HighMount acknowledges, the trial court expressly reserved the issue of "if and when" the JOA terminated for trial and HighMount did not appeal that ruling.

Therefore, we conclude the trial court erred in ruling that the JOA is terminable at will, and we hold that a reasonable term must be implied as the duration of the JOA. We remand to the trial court for a factual determination of what constitutes a reasonable term under the circumstances at the time the JOA was executed.

### *Conclusion*

Based on the foregoing analysis, we reverse the trial court's judgment that Anderson take nothing and render judgment as a matter of law that (1) the Contract Area includes interests acquired by the parties and their successors after the execution date of the JOA, and (2) the JOA is effective for a reasonable time period. We remand to the trial court for further proceedings consistent with our opinion, including a determination of the fact question as to what length of time constitutes a "reasonable time" for the JOA to be effective under the circumstances.

### CROSS-APPEAL

Because we are reversing the trial court's judgment, we must now consider HighMount's issues raised on cross-appeal. HighMount asserts the trial court erred in failing to grant summary judgment on its affirmative defenses of Statute of Frauds, waiver, and laches. HighMount contends these alternative defenses bar all of Anderson's claims because each claim is based on the AMI and/or PRP provision of the JOA.

To obtain a summary judgment on an affirmative defense, a defendant must prove each element of the affirmative defense as a matter of law. *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 121 (Tex. 1996); *see also* TEX. R. CIV. P. 94 (listing statute of frauds, waiver, and laches as affirmative defenses). If the defendant proves the affirmative defense, the burden shifts to the plaintiff to produce evidence raising a genuine issue of material fact to avoid the summary judgment. *Id.* In determining whether there is a disputed issue of material fact precluding summary judgment, evidence favorable to the non-movant is taken as true, and every reasonable inference is indulged in the non-movant's favor. *Nixon,* 690 S.W.2d at 548-49.

### *(1) Statute of Frauds*

HighMount asserts it was entitled to summary judgment because the JOA's description of the Contract Area by reference to Exhibit A's eight maps fails to satisfy the Statute of Frauds which requires a reasonably certain property description. HighMount contends the JOA does not contain a sufficient property description within itself or by reference to other existing documents because extrinsic evidence must be consulted to locate and define the boundaries of the acreage shown on the maps. Anderson does not challenge the applicability of the Statute of Frauds to the JOA, but contends the description of the Contract Area in the maps and other documents referenced in the JOA is sufficient to identify the acreage with reasonable certainty, thereby satisfying the Statute of Frauds. Accordingly, Anderson contends HighMount failed to prove its Statute of Frauds defense as a matter of law.

The Statute of Frauds requires that contracts for the sale of real property be in writing and signed by the person to be charged. TEX. BUS. & COM. CODE ANN. § 26.01(a), (b)(4) (West 2015); *see also* TEX. PROP. CODE ANN. § 5.021 (West 2014) (statute of conveyances requires that a conveyance of real property must be in writing and subscribed to and delivered by the conveyor). Oil and gas interests constitute real property; therefore, an agreement for the transfer or assignment

of a mineral interest must comply with the Statute of Frauds. *Long Trusts v. Griffin*, 222 S.W.3d 412, 416 (Tex. 2006) (per curiam); *see also Westland*, 637 S.W.2d at 910-11 (area of mutual interest is a real property interest); *Reiland v. Patrick Thomas Props., Inc.*, 213 S.W.3d 431, 434 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (applying Statute of Frauds to a right of first refusal). To satisfy the Statute of Frauds, a contract "must furnish within itself, or by reference to some other existing writing, the means or data by which the [property] to be conveyed may be identified with reasonable certainty." *Long Trusts*, 222 S.W.3d at 416; *Templeton v. Dreiss*, 961 S.W.2d 645, 658 (Tex. App.—San Antonio 1998, pet. denied). Even if the record is clear that the parties to the contract knew and understood what property was intended to be conveyed, the knowledge and intent of the parties will not make the contract valid. *Morrow v. Shotwell*, 477 S.W.2d 538, 540 (Tex. 1972). If the contract does not sufficiently describe the real property interest to be conveyed, the conveyance is void under the Statute of Frauds and will not support an action for specific performance or breach of contract. *Pick v. Bartel*, 659 S.W.2d 636, 637 (Tex. 1983); *Wilson v. Fisher*, 144 Tex. 53, 188 S.W.2d 150, 152 (1945).

The sufficiency of a legal description in any instrument transferring a property interest is a question of law subject to de novo review. *Dixon v. Amoco Prod. Co.*, 150 S.W.3d 191, 194 (Tex. App.—Tyler 2004, pet. denied). The contract's property description need not be mathematically certain, but only "reasonably certain" so as to enable a person familiar with the area to identify the property to be conveyed to the exclusion of other property. *Gates v. Asher*, 154 Tex. 538, 280 S.W.2d 247, 248 (1955); *Templeton*, 961 S.W.2d at 659. The purpose of the written description is not to identify the land, but to provide a *means* of identification. *Reiland*, 213 S.W.3d at 437 (citing *Jones v. Kelley*, 614 S.W.2d 95, 99-100 (Tex. 1981)) (emphasis added). The property description must furnish enough information to locate the general area "as in identifying it by tract survey and county," as well as to determine the "size, shape, and boundaries" of the property.

- 20 -

*Reiland*, 213 S.W.3d at 437 (citing *Morrow*, 477 S.W.2d at 539). When the language in the contract furnishes a "key or nucleus" description of the property, extrinsic evidence may then be used merely as an aid to identify the property with reasonable certainty from the data contained in the contract, not to supply a missing description. *Long Trusts*, 222 S.W.3d at 416; *Templeton*, 961 S.W.2d at 658-59.

Applying these principles to the description of the Contract Area, we begin with the JOA itself. The JOA states that the AMI and PRP provisions at issue apply to the Contract Area. The first page of the JOA states the physical location of the Contract Area as within four Texas counties; Edwards, Crockett, Sutton, and Terrell. As set forth in detail earlier in this opinion, the JOA defines the Contract Area by reference to the attached Exhibit A, which, in turn, describes the Contract Area as "all interest of [the] parties in the land located within the areas outlined on the attached plats marked Exhibits A-1 through A-8." The parties agree that the eight maps are Midland Maps, a standard map used in the oil and gas industry, which were reduced in size so they could be attached to the JOA. As shown in the reproduction of one of the maps, *supra*, each map depicts a large area of platted land, with an irregularly-shaped area outlined in hash marks and smaller areas of stippling shown on some of the tracts, both inside and outside the hash-marked areas. The maps also depict natural landmarks such as rivers. The maps each state the name of the area depicted, e.g., "Marjorie Canon Brown Area," and contain the notation "A.M.I." Exhibit A also refers to a list of "initial wells" to be mutually agreed to by the parties on or before the closing date of April 1, 1980.

The JOA also references the parties' Letter Agreement, and fully incorporates it through Article XV(D). The Letter Agreement states that Sun Gas was purchasing an interest in Perlman's "wells and leases in various areas in Edwards, Crockett, Sutton and Terrell Counties, Texas," and refers to "Schedule A" as the list of the 37 wells and attributable leasehold estates. The Letter

Agreement also provides the total acreage covered by the agreement, stating in section 5 that Perlman "own[s] leasehold interests *within the outlined areas* on the attached plats covering at least 62,000 net acres." (emphasis added). Schedule A attached to the Letter Agreement lists the wells and leases assigned by Perlman to Sun Gas, and identifies them by area names which correspond to the area names on the eight maps. Schedule A provides more detailed information than the maps, describing the physical location of each well and lease under an area name by field name and coordinates, block and section numbers, survey names, and county. For example, the "No. 1 Marjorie Canon Brown '5'" is described as "Loc: 1980 FSL, 1980 FEL, Sec 5, Blk 1, T.C.R.R., Terrell County, Texas, SE 160 Acres Sec 5, Wildcat (Strawn-Atoka, Canyon Ss)." Finally, the "Assignment of Leases" attached to the Letter Agreement lists the Perlman leases by lessor name and states the volume and page number where each lease is recorded in the particular county's deed records.

Viewing the JOA and its Exhibit A maps along with the incorporated Letter Agreement and its attached Schedule A, we conclude that the JOA contains enough information to provide at least a nucleus description of the Contract Area with respect to its physical location and its size, shape, and boundaries. *See Reiland*, 213 S.W.3d at 437.

As discussed at length in the parties' briefs, extrinsic evidence was also presented in the form of affidavits by three surveyors/geological engineers familiar with the area, with Anderson's two experts opining that they were able to locate the Contract Area on the ground with reasonable certainty using the maps, and HighMount's expert opining that he could not determine the Contract Area with reasonable certainty without resorting to additional information outside the maps. As noted, resort to extrinsic evidence is not for the purpose of supplying the location or description of the property, but only for the purpose of identifying it with reasonable certainty from the information in the contract. *See Wilson*, 188 S.W.2d at 152.

HighMount presented the affidavit of Jeffrey D. Suiter, an experienced surveyor since 1987 who is familiar with the areas of Sutton, Crockett, Edwards, and Terrell Counties. Based on Suiter's affidavit, HighMount's position is that the eight maps fail to provide sufficient information to locate the lands comprising the Contract Area with sufficient certainty for three reasons: (1) the maps contain two marked areas—one marked by hash marks and the other marked by stippling—and the JOA does not identify which marking is intended to denote the Contract Area; (2) assuming the hash marks are intended to identify the Contract Area, the hash marks themselves stretch across hundreds of yards on the maps and it appears the boundary is situated on the outside of the hash mark in some areas, on the inside of the hash mark in other areas, and in the middle of the hash mark in still other areas; and (3) some of the hash marks run through the middle of surveys and do not coincide with survey lines or established tract boundaries. Suiter's affidavit states that additional information not provided in the JOA or its attachments is required to understand the meaning ascribed to the stippling and hash marks depicted on the eight maps; in his experience, stippling on maps is not used in the oil and gas industry to designate leases. Suiter also noted inconsistencies in the placement of the stippling, assuming it was meant to represent leases, noting that the R. Cauthorn map has no stippling but Perlman owned leases in that area at the time. Suiter further opined that, in his experience as a surveyor in the oil and gas industry, the outer border of the hash mark always denotes the outer perimeter of the lands or interests identified. But, a problem arises when significantly reduced scale maps are used, as here, because the hash mark itself can be "a width spanning hundreds of yards (or even miles) across" which makes the identification of lands to the exclusion of others "impracticable using this method." Suiter also stated that the hash marks do not follow the survey lines in many places on the maps, and that there is nothing in the JOA to indicate that a straight line connecting two known points was intended to be used in those places.

In support of its position, Anderson presented an affidavit by Donald E. Henkel, the geologist Perlman employed to prepare the eight maps in 1980. Henkel stated he had forty years' experience in the oil and gas industry and was familiar with the region in and around the four counties. Henkel stated that he used Midland Map Company maps which "have been the standard product used for numerous purposes related to oil and gas practice in Sutton, Crockett, Edwards, and Terrell Counties" and the maps "have proven consistently reliable in their scale and in accurately reflecting major landmarks, survey names, abstract numbers, and property lines." The maps were "reduced in size from the standard scale of 1 inch per 4,000 feet" so they could be attached to the JOA. Henkel stated he outlined the Contract Area on each map after they were reduced in size by using hash marks to show the boundaries. He used stippling to indicate the oil and gas leases owned by Perlman at the time, which was a practice used by Perlman. Henkel stated he followed survey lines in mapping the Contract Area, but where it was not practical to do so, he drew straight lines to connect two points. In his deposition, Henkel stated his intention was that the inside of the hash marks be used to place the boundaries of the Contract Area. Henkel also stated in the affidavit that the assignments of the Perlman wells and leases were filed of record in the respective county deed records, and "[t]he location of the maps in Exhibit A corresponded to the location of the leases and wells transferred from Perlman to Sun . . . and all of the wells and leases transferred were within the Contract Area represented on the maps." Finally, Henkel stated that, upon reviewing the maps, he recognizes the "general location of the Contract Area" and numerous markers such as the "Pecos River, Interstate 10 corridor, the city of Sonora, along with numerous survey names and abstract numbers." Henkel opined that, based on his review of the maps, he "would have no difficulty in causing the areas in the maps to be located on the ground;" "no difficulty in causing the boundaries of the Contract Area to be located;" and "the location of

the Contract Area's boundaries and the property that is included within the Contract Area are identifiable to a reasonable certainty."

Anderson also submitted the affidavit of another experienced surveyor familiar with the region, Carr Benton Thomson, who opined that the boundaries of the property depicted on the maps are identifiable to a reasonable certainty. Thomson explained that he considered all the maps together, "especially where it appears that common lines were intended to be used as boundaries on multiple maps." He stated that the boundaries follow established survey lines, which are "locatable on the ground without substantial challenge using basic surveying techniques." In the instances where the survey lines were not followed, Thomson stated a straight line between two known points was used.

HighMount attacks Henkel's affidavit as improper extrinsic evidence that is necessary to supply the descriptive information missing from the maps themselves. We disagree. Henkel's affidavit shows he followed basic surveying principles in creating the boundaries of the Contract Area by using Midland Maps which are accepted in the region for their accuracy, following existing survey lines where possible, and using natural and artificial monuments such as the river and highway. *See King Ranch, Inc. v. Garcia*, No. 04-13-00605-CV, 2014 WL 4627592, at *3-4 (Tex. App.—San Antonio Sept. 17, 2014, pet. denied) (mem. op.) (discussing accepted surveying principles such as following in "the footsteps of the original surveyor" as closely as possible, following existing survey lines and property lines, and using monuments to fix the actual location of the line on the ground); *see also Silver Oil & Gas, Inc. v. EOG Res., Inc.*, 246 S.W.3d 197, 204 (Tex. App.—San Antonio 2007, no pet.). The Henkel affidavit is not being used to supply missing information but, rather, to explain the geographic maps used to form the "nucleus" of the property description and to identify the land on the ground with reasonable certainty. *See Gates*, 280 S.W.2d at 248 ("While the accepted rule in this jurisdiction employs a rather strict application of

the statutes of frauds and conveyances, yet the words of description are given a liberal construction in order that the conveyance may be upheld. Parol evidence is admitted to explain the descriptive words and to identify the land, where the instrument contains the 'nucleus' of description."); *see also W. Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 265 (Tex. App.—Austin 2002, no pet.) (recognizing that where the contract description provides the "framework or skeleton," parol evidence may be used to fill in a detail such as the exact width of an easement).

While the sufficiency of a property description under the Statute of Frauds is a question of law, the court may properly consider extrinsic evidence in determining whether a person familiar with the area could locate the property with reasonable certainty. *May v. Buck*, 375 S.W.3d 568, 574 (Tex. App.—Dallas 2012, no pet.). In this case, the trial court was presented with evidence in the form of expert testimony establishing that the boundaries of the Contract Area could be located with reasonable certainty based on the maps. *See Schuhardt Consulting Profit Sharing Plan v. Double Knobs Mountain Ranch, Inc.*, 426 S.W.3d 800, 803-04 (Tex. App.—San Antonio 2014, pet. denied) (holding easement did not violate Statute of Frauds based on surveyor's testimony that he could locate the easement with reasonable certainty using aerial photographs); *see also W. Beach Marina*, 94 S.W.3d at 266 (holding description sufficient to locate easement with reasonable certainty where evidence included affidavit testimony of surveyor concluding description was sufficient even though evidence also included affidavit testimony of second surveyor with opposite opinion); *Dixon*, 150 S.W.3d at 194-95 (description of property included in gas unit designation was sufficient to comply with the Statute of Frauds, even if there were mistakes or discrepancies, where property was described by list of leases and a map with bold outline of property and surveyor testified he was able to locate the property with reasonable certainty).

Because the JOA, and the documents referenced in it, provide a sufficient nucleus of a property description to enable a person familiar with the area to locate the land and boundaries of

the Contract Area with reasonable certainty, summary judgment was not proper on the ground of Statute of Frauds. *See* TEX. R. CIV. P. 166a(c).

### *(2) Waiver and Laches*

HighMount next contends it was entitled to summary judgment on its affirmative defenses of waiver and laches. HighMount asserts that Anderson waived its right to enforce the AMI and PRP provisions through its conduct during the preceding twelve years—by failing to honor its own obligations under those provisions and by failing to assert its rights under those provisions. Specifically, HighMount argues Anderson engaged in acquisitions and transfers of its interest within the Contract Area without notifying HighMount, or its predecessors, and offering them an opportunity to participate under the AMI provision, and that Anderson failed to enforce the PRP provision against HighMount and/or its predecessors. Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming the right. *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) (per curiam) (waiver is "largely a matter of intent"). To find an implied waiver based on a party's conduct, the party must say or do something inconsistent with an intent to rely upon the right. *Id.* (intent to relinquish the right must be clearly demonstrated by the surrounding facts and circumstances). Waiver is ordinarily a question of fact. *Id.* Only when the surrounding facts and circumstances are undisputed does the issue become one of law. *Id.* at 156-57.

Here, Anderson presented evidence disputing its intent behind the challenged transactions. Its principal, Steve Anderson, testified that he was in communication with HighMount's predecessors during the 1990's and was informed that they had no interest in participating in the small, non-operated working interests that Anderson was acquiring in the Contract Area. In addition, Anderson testified that the challenged assignments were excluded from the JOA's provisions for different reasons, with some falling within the "related entities" exception, some

constituting "trade" or barter transactions, some not involving interests inside the Contract Area, etc. HighMount argues that such testimony amounts to mere excuses and is not credible or persuasive, which are matters for a fact finder to resolve. In view of the conflicting evidence, we conclude that a fact issue exists as to whether Anderson's conduct was so inconsistent with an intent to rely on the right to enforce the AMI and PRP provisions so as to amount to a waiver of that right. Therefore, HighMount was not entitled to summary judgment on its waiver defense. *See* Tex. R. Civ. P. 166a(c).

HighMount asserts that laches bars Anderson's claims because Anderson knew of an assignment of interests subject to the JOA between Parker & Parsley and Louis Dreyfus in 1993, but did nothing about the violation for fourteen years, after millions of dollars were spent by HighMount and its predecessors developing the acreage. Laches is an equitable defense that prevents a plaintiff from asserting a claim due to delay—"not mere delay but delay that works a disadvantage to another." *Culver v. Pickens*, 142 Tex. 87, 176 S.W.2d 167, 170-71 (1943). Two essential elements must exist for laches to bar a claim: (1) a party's unreasonable delay in asserting a legal or equitable right; and (2) a good faith change of position by another to his detriment because of the delay. *Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 80 (Tex. 1989).

As a general rule, laches is inappropriate when a statute of limitations applies to the cause of action. *See Lyle v. Jane Guinn Revocable Trust*, 365 S.W.3d 341, 355 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see also Garcia v. Garza*, 311 S.W.3d 28, 40 (Tex. App.—San Antonio 2010, pet. denied) (the application of laches is usually limited to cases arising out of equity, or actions at law that are essentially equitable in character, and may not be invoked against enforcement of a purely legal right such as a claim for breach of contract). In exceptional circumstances, however, laches may bar a claim in a period shorter than the applicable statute of limitations. *Graves v. Diehl*, 958 S.W.2d 468, 473 (Tex. App.—Houston [14th Dist.] 1997, no

pet.). We find no such exceptional circumstances here, and hold laches does not apply to Anderson's claims for breach of contract and tortious interference with contract which were filed within the applicable statutes of limitations. *Lyle*, 365 S.W.3d at 355; TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a) (West 2002). To the extent Anderson asserts equitable claims for relief,[7] we conclude HighMount failed to present summary judgment proof conclusively establishing that, acting in good faith, it changed its position based on the delay and that such change in position was detrimental to HighMount. Therefore, summary judgment on the ground of laches was not appropriate. *See* TEX. R. CIV. P. 166a(c).

## CONCLUSION

Based on the foregoing reasons, we reverse the trial court's judgment in part and render judgment that the Contract Area includes interests acquired by the parties and by their successors after the execution date of the JOA, and that the JOA is effective for a reasonable term. We affirm the portion of the trial court's judgment denying summary judgment for HighMount on its affirmative defenses, and we remand to the trial court for further proceedings consistent with our opinion, including a determination of what period of time constitutes a reasonable term for the JOA.

Rebeca C. Martinez, Justice

---

[7] Anderson seeks specific performance of the AMI and PRP provisions. Specific performance is an equitable remedy that may be awarded for a breach of contract, as a substitute for money damages when such damages would not be adequate. *Davis v. Luby*, No. 04-09-00662-CV, 2010 WL 3160000, at *3 (Tex. App.—San Antonio Aug. 11, 2010, no pet.) (mem. op.) (specific performance is not a separate cause of action); *Stafford v. S. Vanity Magazine, Inc.*, 231 S.W.3d 530, 535 (Tex. App.—Dallas 2007, pet. denied) (same). Anderson also pled for an accounting. A suit for an accounting is generally founded in equity. *Sw. Livestock & Trucking Co. v. Dooley*, 884 S.W.2d 805, 809 (Tex. App.—San Antonio 1994, writ denied) (citing *Palmetto Lumber Co. v. Gibbs*, 124 Tex. 615, 80 S.W.2d 742, 748 (1935)).