**Opinion filed September 12, 2024**



In The

# Eleventh Court of Appeals

_____

## No. 11-22-00350-CV

_____

### ETC TEXAS PIPELINE, LTD., Appellant

### V.

### XTO ENERGY INC., Appellee

**On Appeal from the 385th District Court**
**Midland County, Texas**
**Trial Court Cause No. CV57367**

## O P I N I O N

This is an appeal from a summary judgment in a contractual dispute. Appellant, ETC Texas Pipeline, Ltd. (ETC), and Appellee, XTO Energy Inc. (XTO), are sophisticated parties who entered into a contract for the gathering and processing of gas. The parties established the basic structure for their working relationship when they executed a Gathering and Processing Agreement (GPA) in 2011. The GPA did not require the parties to enter into any specific transaction for the gathering

and processing of gas; however if they chose to do so, an Individual Transaction Confirmation (ITC) would "amend" the agreement by adding practical details of the contractual relationship. The parties did enter into one such ITC agreement, dated October 1, 2013 (2013 ITC), and later amended the 2013 ITC on October 1, 2016 (2016 ITC).

The parties disagree as to the scope and construction of the operative contracts, particularly regarding whether XTO has an exclusive commitment to supply all gas extracted from the Dedicated Acreage to ETC, and whether ETC has a right to recover expectancy damages and reliance damages as a result of gas having been sold by XTO to entities other than ETC. Additionally, there is a dispute about the sufficiency of the Dedicated Acreage map, and whether the map itself voids the contract under the statute of frauds. Having heard multiple motions for summary judgment, the trial court entered a final judgment for XTO. We reverse and remand in part, and we affirm in part.

*Background and Procedural History*

In 2011, ETC and XTO created and executed a base agreement (the GPA) to guide the structure of their relationship—XTO would produce gas, which would pass to a receipt point and to an ETC plant for processing. The GPA was intended to apply to any future ITCs created for the gathering and processing of gas. The ITC (and its amendments) and the GPA were intended to constitute a single integrated agreement, with discrepancies to be resolved in favor of the ITC terms.

The 2016 ITC *amended* the original 2013 ITC. ETC claims, and XTO does not deny, that, over time, the parties amended the ITC a total of twelve times—each including the following statement: "The Agreement is amended to the extent noted herein. In all other respects, it is confirmed and shall continue in full force and effect." The amendments largely included changes to descriptions about the gathering systems, to the "fees and throughout commitment" section (considering

2

changes to MMBtu amounts), and updates to Receipt Points—including the latitude and longitude identification and/or legal descriptions of those points.  Both the 2013 ITC and the 2016 ITC include the same map of the Dedicated Acreage, as well as a provision indicating that the gathering and processing subject to the contract is contained within the area depicted on the map.[1]

In its brief on appeal ETC claims, among other things, that:

> The parties worked together successfully for several years.  XTO produced a substantial amount of gas from the [Dedicated Acreage], ETC received and processed it, and new facilities were built as needed.  XTO then sold the improved gas to third parties while ETC earned fees for gathering and improving the gas.

In 2019, ETC claims that, at a semi-annual meeting, XTO admitted to sending gas from the Dedicated Acreage area to ETC competitors, leading ETC to believe that XTO breached the exclusivity clause in the agreement.  Section 4.1 of the GPA reads:

> Shipper hereby dedicates for gathering and processing hereunder all of the Gas owned or controlled by Shipper or an Affiliate of Shipper that is produced from the area depicted on the map attached to the applicable ITC as Appendix 1.

XTO claims on appeal that ETC did not have the capacity to take all the gas XTO produced, causing XTO to "flare" (i.e., burn) some of the gas instead of being able to sell it.

In May 2020, ETC sought injunctive relief against XTO in Dallas County.  A temporary restraining order was granted, but following a hearing, the TRO was dissolved, and ETC's request for injunctive relief was denied.  The case was

---

[1]This Dedicated Acreage map is drawn using "bubbles" to circle broad multi-county areas on a map of West Texas without outlines of specific sections, blocks, or legal descriptions of same.

subsequently transferred to Midland County. The final judgment from the Midland County district court is at issue in this appeal.

In the Midland trial court, ETC raised claims related to damages. In response, XTO filed a traditional and no-evidence motion for partial summary judgment on ETC's theories of damages and a motion to exclude ETC's damages evidence, alleging that it was untimely, irrelevant, and unreliable. In the traditional motion for summary judgment, XTO argued that the "Limitation of Liability" provision in Section 13.2 of the GPA prohibited ETC from recovering lost profit damages. The trial court granted the motion in part—only as it related to lost profits—ordering that ETC was "not entitled to request or recover direct or indirect lost profits should it prevail on its claims and causes of action." The trial court denied the remainder of the motion—including the no-evidence motion for summary judgment.

In a motion to exclude ETC's damages evidence, XTO argued that the evidence that ETC attempted to use to prove damages was not only lost profit damages prohibited by the GPA but was barred by Rule 193.6(a) of the Texas Rules of Civil Procedure because it was untimely provided. *See* TEX. R. CIV. P. 193.6. The trial court granted the motion to exclude ETC's damages evidence and further ordered that ETC could not introduce evidence in support of its claim for damages.

XTO also filed a motion for partial summary judgment based on the statute of frauds. XTO argued that the Dedicated Acreage map violated the statute of frauds— meaning that, by incorporation, there was no valid Dedicated Acreage defined within the ITCs. XTO claimed that the Dedicated Acreage map was invalid because the "dotted boundary" of the superimposed circular bubbles on the West Texas map would have a corresponding width of approximately 4,000 feet (when considered to scale on the map). This, XTO argued, rendered the map—and only the map— unenforceable under the statute of frauds.

4

The trial court signed its final judgment on December 9, 2022. The trial court ruled that: (1) the area depicted by the Dedicated Acreage map was unenforceable under the statute of frauds, but excepted from that ruling those tracts within the Dedicated Acreage, which had been more fully described with legal descriptions in written amendments to the 2016 ITC; (2) pursuant to Rule 166a of the Texas Rules of Civil Procedure, ETC take nothing on its claims for breach of contract, fraud in the inducement, fraud and string along fraud, negligent misrepresentation, unjust enrichment, and quantum meruit; (3) ETC's and XTO's declaratory judgment claims were dismissed without prejudice as moot as a result of the statute of frauds ruling; and (4) XTO would recover from ETC all of XTO's taxable court costs under Rule 131. The trial court's ruling on the statute of frauds, together with all prior orders and nonsuits by ETC and XTO, were incorporated into and constituted the trial court's final judgment.

ETC presents five issues for review on appeal: (1) XTO did not conclusively establish its statute of frauds defense; (2) XTO did not conclusively negate ETC's right to expectancy damages; (3) XTO did not conclusively negate ETC's proof of reliance damages; (4) XTO did not conclusively negate ETC's right to seek equitable relief; and (5) any remand on damages should also include ETC's tort and quasi-contract claims. We address the issues in the order they were presented on appeal.

*Issue One: Statute of Frauds*

In ETC's first issue, it argues that the statute of frauds does not apply to this contract due to the statute's exceptions, but that even if it did, it is fully satisfied by the writing. ETC includes analysis related to three purported exceptions to the statute of frauds: ratification, estoppel, and partial performance. The trial court determined that only a small part of the ITC was void under the statute of frauds— that area which was depicted by the Dedicated Acreage map. Any tracts within the Dedicated Acreage, which were identified with legal descriptions, were excluded

5

from the trial court's ruling. Although we agree that the statute of frauds is applicable here, we reverse and remand to the trial court for further proceedings.

*Standard of Review and Applicable Law*

"We review an order granting summary judgment de novo, generally taking as true all evidence favorable to the nonmovant and indulging every reasonable inference in the nonmovant's favor." *Concho Res., Inc. v. Ellison*, 627 S.W.3d 226, 233 (Tex. 2021) (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005)). A party moving for traditional summary judgment has the burden of establishing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). "[A] defendant who conclusively negates at least one essential element of a cause of action or conclusively establishes all the elements of an affirmative defense is entitled to summary judgment." *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 79 (Tex. 2015).

When, as here, the trial court specifies the ground on which the motion for summary judgment was granted, the court of appeals should consider the ground ruled on, but may also consider, in the interest of judicial economy, other grounds preserved for appellate review that the trial court did not rule on. *Gamma Grp., Inc. v. Home State Cnty. Mut. Ins. Co.*, 342 S.W.3d 762, 765–66 (Tex. App.—Dallas 2011, pet. denied) (citing *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex. 1996)). The Court in *Cates* explained that this limited consideration by an appellate court prevents the higher court from usurping the trial court's authority to consider and rule on issues before it—thereby also denying the appellate court the benefit of the trial court's decision on the issue—if, for example, the appellate court affirms a summary judgment on an independent ground that was not specifically considered by the trial court. *Cates*, 927 S.W.2d at 626. In this case, the final

6

judgment makes it clear that the trial court's decision was based upon XTO's statute of frauds argument.

XTO pled the statute of frauds as an affirmative defense and thus had the initial burden to establish that the statute of frauds applied. *See* TEX. BUS. & COM. CODE ANN. § 26.01 (West 2023); TEX. R. CIV. P. 94. "Whether a contract comes within the statute of frauds is a question of law, which we review de novo." *Dynegy, Inc. v. Yates*, 422 S.W.3d 638, 642 (Tex. 2013). Contending that a contract is unenforceable under the statute of frauds is an affirmative defense. *See* TEX. R. CIV. P. 94. "To obtain summary judgment on an affirmative defense, a defendant must plead and conclusively establish each element of an affirmative defense thereby rebutting the plaintiff's cause of action." *Biko v. Siemens Corp.*, 246 S.W.3d 148, 159 (Tex. App.—Dallas 2007, pet. denied) (citing *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979)).

When an agreement falls under the statute of frauds, the statute of frauds generally requires that the agreement be in writing and signed by the person(s) "charged with the promise or agreement"—or by a person authorized to sign for him. BUS. & COM. § 26.01(a). The statute of frauds applies to a variety of "promise[s] or agreement[s]," including conveyances of real property and agreements that cannot be performed within one year from the making of the agreement. *See id.* at § 26.01(b)(4), (b)(6). Oil and gas interests constitute real property; thus, any agreement for the transfer or assignment of a mineral interest must comply with the statute of frauds. *Anderson Energy Corp. v. Dominion Okla. Tex. Expl. & Prod., Inc.*, 469 S.W.3d 280, 295 (Tex. App.—San Antonio 2015, no pet.) (citing *Long Trusts v. Griffin*, 222 S.W.3d 412, 416 (Tex. 2006) (per curiam)). When a contract provides that it is to span a duration of more than one year, it is subject to the statute of frauds. *See Farone v. Bag'n Baggage, Ltd.*, 165 S.W.3d 795, 800 (Tex. App.—Eastland 2005, no pet.).

*Analysis*

First, we agree with the trial court that the contract is subject to the statute of frauds. We disagree, however, with the trial court's ruling and final judgment to the extent that it found that a portion of the contract does not meet the statute's requirements. We also disagree with XTO that the contract falls within the statute of frauds because it is a conveyance of real property.[2] In this regard, the contract specifies that it is a service contract. The GPA specifies that the agreement is for the "Tender of Gas and Gathering Services," and both the 2013 ITC and 2016 ITC indicate that the contract governs the service of "Shipper"—XTO's—reserved capacity. The ITCs each include the conditions under which dedicated gas may be temporarily or permanently released, but it is clear that these are circumstances for nonperformance of the contract, rather than performance. *See Farone*, 165 S.W.3d at 800. And although the 2016 ITC includes a calculation for the "Gatherer's Share" (the "Gatherer" being ETC), it does not shift the purpose of the contract from a service contract to a contract for the transfer of a mineral interest and, in turn, a contract for the sale of real property.

Instead, the contract is subject to the statute of frauds because the 2013 ITC and 2016 ITC include contract terms, or agreements, that require performance beyond one year. *See* BUS. & COM. § 26.01(b)(6). "An agreement that fixes a definite period longer than a year during which performance shall continue indicates that the parties did not contemplate earlier performance." *Walker v. Tafralian*, 107

---

[2]The cases cited by XTO on appeal all relate to the *transfer* of oil and gas leases or the working interest in such a lease. *See Long Trusts*, 222 S.W.3d at 416 (the respondent agreed to pay part of drilling and operating costs in exchange for an assignment of part of the working interest in producing wells); *U.S. Pipeline Corp. v. Kinder*, 609 S.W.2d 837, 838–39 (Tex. App.—Fort Worth 1980, writ ref'd n.r.e.) (the seller and buyer contracted to sell and purchase natural gas produced in the seller's dedicated acreage and title ultimately passed from the seller to the buyer); *see also B&A Pipeline Co. v. Dorney*, 904 F.2d 996, 997 (5th Cir. 1990) (the parties entered into a gas purchase contract where the seller was to sell and deliver to the buyer natural gas produced from a designated area). Here, the transfer is only for ETC to transport and process the gas at issue, not to take ownership of it.

S.W.3d 665, 669 (Tex. App.—Fort Worth 2003, pet. denied) (citing *Mann v. NCNB Tex. Nat'l Bank*, 854 S.W.2d 664, 668 (Tex. App.—Dallas 1992, no writ); *Vess Beverages, Inc. v. Paddington Corp.*, 886 F.2d 208, 213 (8th Cir. 1989)).  The term in the 2016 ITC begins on November 1, 2016 and continues through July 31, 2029—a period that is undisputedly longer than one year.  The contract has been memorialized in writing, with the primary dispute centering on the Dedicated Acreage map—Appendix 1 to both the 2013 ITC and 2016 ITC—and whether the map is sufficiently clear under the statute of frauds writing requirement.[3]

XTO argues that the Dedicated Acreage map as drawn is not sufficient to satisfy the writing requirement for the statute of frauds.  We disagree.  To satisfy the statute of frauds, the writing must either "furnish within itself, *or by reference* to some other existing writing, the means or data by which the [property] to be conveyed may be identified with reasonable certainty."  *Anderson*, 469 S.W.3d at 295 (emphasis added) (quoting *Long Trusts*, 222 S.W.3d at 416).  The purpose of the statute of frauds is "to prevent fraud and perjury in certain kinds of transactions by requiring agreements to be set out in a writing signed by the parties."  *Kalmus v. Oliver*, 390 S.W.3d 586, 589 (Tex. App.—Dallas 2012, no pet.) (quoting *Haase v. Glazner*, 62 S.W.3d 795, 799 (Tex. 2001)).  That purpose is foiled if we do not consider the function of the Dedicated Acreage map as it relates to the agreement in its entirety.

It is clear from the GPA and the ITCs, as well as the evidence in the record, that the Dedicated Acreage map was never meant to provide the specific receipt points and processing centers that were subject to the agreements.  Instead, the Dedicated Acreage map was meant to provide a general area—to be further defined

---

[3]We do not include with this opinion a copy of the Dedicated Acreage map because, while illegible reproductions appear elsewhere in the record, the only marginally readable map provided is a part of the record that was sealed by the trial court.

by XTO—in which the parties were to do business together. In other words, the map was intended to confine the agreement to these particular counties, rather than to make the agreement subject to any area in the State of Texas. From the Dedicated Acreage map, either party may view which counties are affected, where the pipeline falls, and the location of major roadways. But the record on appeal lacks information related to specifics which would allow a more complete analysis. There are obviously areas within the map that are clearly shown as included acreage—notably Midland and Glasscock Counties with diminutive exceptions. To the contrary, none of Reagan County is circled as part of the Dedicated Acreage map except for a modest portion of the northwest corner. The record also lacks information about the produced gas in dispute—what leases it came from and where those leases are located. Those leases may be clearly identifiable within an area shown on the Dedicated Acreage map for statute of frauds purposes—or not, depending on the county[4]—but it is impossible to identify any specific leases from the map. We conclude that XTO did not meet its burden to show that the *entire* map was void under the statute of frauds as applied to the disputed breach.

Additionally, the map itself indicates that XTO would provide further "specific lease information and plats" to ETC. These constitute another "existing writing" referenced in the document, that can be consulted to determine the specific "boundary" of the Dedicated Acreage map. *See generally Anderson*, 469 S.W.3d at 295. Further, the ITC amendments provide the latitude and longitude of the meters—"receipt points"—which are subject to the agreement, as well as various acquired and divested XTO acreage. This constitutes additional written information

---

[4]For a lease in Reagan County, there might very well be a statute of frauds defense based on the lack of specificity of the Dedicated Acreage map regarding that specific county, but for leases in Midland and Glasscock Counties, a statute of frauds defense based on the lack of specificity of the map would be more difficult.

furnished in the document to assist with the determination of the area referred to as the Dedicated Acreage.

XTO only argued that the Dedicated Acreage map was not sufficient enough to meet the statute of frauds and was, therefore, unenforceable. This is a broad argument. In any event, XTO conceded that the specifically dedicated "receipt points," which are identified with latitude and longitude coordinates, are sufficiently specific and enforceable. Clarity in the "receipt points" is necessary, as that is where the gas is delivered and received into the gathering system. Thus, based on the purpose of the map as it relates to the service contract, as well as the ability to discern the boundaries with another "existing writing," the Dedicated Acreage map is not void *in toto* under the statute of frauds.

XTO's summary judgment evidence, with regard to the disputed gas that was allegedly processed by entities other than ETC, does not conclusively demonstrate that the dedication of such acreage is void under the statute of frauds. Therefore, we need not address Appellant's arguments regarding the applicability of three exceptions that allow for the enforcement of a contract otherwise unenforceable under the statute of frauds: ratification, estoppel, and partial performance. *See* TEX. R. APP. P. 47.1.

We also sustain ETC's first issue to the effect that the Dedicated Acreage map is not void in its entirety under the statute of frauds.

*Issues Two and Five: Expectancy Damages*

In ETC's second issue, it argues that the contract's damage limitation clause was misinterpreted, resulting in the exclusion of lost profits as recoverable "direct" damages. In response, XTO argues that the trial court correctly excluded recovery of *all* lost profit damages. As set forth below, we affirm the judgment of the trial court to the extent that it excluded ETC's recovery of all lost profit damages. In so

11

doing, we overrule ETC's fifth issue, that any remand on damages should also include ETC's tort and quasi-contract claims.

*Standard of Review*

We review de novo the trial court's ruling on XTO's motion for summary judgment. *See Concho Res.*, 627 S.W.3d at 233. Where, as here, there is a claim of breach of contract, "[w]e must construe contracts by the language contained in the document, with a mind to Texas's strong public policy favoring preservation of the freedom to contract." *FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, 426 S.W.3d 59, 67 (Tex. 2014) (citing *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 811–12 (Tex. 2012)); *see also Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 26 (Tex. App.—Amarillo 2000, no pet.) ("In short, the parties strike the deal *they* choose to strike and, thus, voluntarily bind themselves in the manner they choose."). "[S]ophisticated parties have broad latitude in defining the terms of their business relationship." *Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 889 (Tex. 2021) (quoting *FPL Energy, LLC*, 426 S.W.3d at 67). "[C]ourts are obliged to enforce the parties' bargain according to its terms." *Id.* (citing *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) ("We have long held that courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained.")). "[C]ourts may not rewrite a contract under the guise of interpretation." *Id.*; *see also Provident Fire Ins. Co. v. Ashy*, 162 S.W.2d 684, 687 (Tex. [Comm'n Op.] 1942) ("Parties make their own contracts, and it is not within the province of this court to vary their terms in order to protect them from the consequences of their own oversights and failures in nonobservance of obligations assumed." (quoting *Dorroh-Kelly Mercantile Co.* v. *Orient Ins. Co.*, 135 S.W. 1165, 1167 (1911))); *E. Tex. Fire Ins. Co. v. Kempner*, 27 S.W. 122, 122 (1894) ("[W]here the language is plain and unambiguous, courts must enforce the contract as made by the parties, and cannot

make a new contract for them, nor change that which they have made under the guise of construction.").

When we interpret a contract, we begin with the contract's express language. *Nettye Engler Energy, LP v. BlueStone Nat. Res. II,* LLC, 639 S.W.3d 682, 689 (Tex. 2022). We interpret the contract in its "plain, grammatical, and ordinary" meaning unless the instrument shows the parties used the terms in a technical sense, or a plain interpretation would "clearly defeat the parties' intentions." *Id.* at 690. We must first decide what the parties intended as evidenced in the written agreement. In construing a written contract, our primary objective is to determine the true intentions of the parties as expressed in the writing. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex.2011). We are to consider the entire writing "in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). If the written agreement is so worded that it can be assigned a certain or definite legal meaning or interpretation, it is not ambiguous, and a court will construe the agreement as a matter of law. *Id.* In construing a written contract, the terms are typically given their plain, ordinary, and generally accepted meaning. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996).

*Analysis*

ETC and XTO memorialized their agreement by creating and executing the GPA and subsequent ITCs, which were subject to the agreements contained in the GPA. In the GPA, the parties created a "Limitation of Liability" which reads:

> Notwithstanding anything to the contrary in this Agreement, any remedies or damages arising from a breach of this Agreement by either Gatherer or Shipper shall be limited to the actual direct and foreseeable costs, losses, or damages caused by or resulting from the breach and incurred by the Party claiming damages. No Party shall be liable to any other Party for any loss of profit or anticipated profit, business interruption, loss of revenue, loss of use, loss of contract, loss of good

13

will, increased cost of working or loss of business opportunity, nor for any indirect loss, consequential loss, or exemplary damages suffered by a Party or any other person, all or any part of which arise out of or related to this Agreement or the performance or breach of this Agreement, or to any act or omission related to this Agreement, whether in contract, warranty, tort (including but not limited to negligence and willful misconduct), strict liability, or any other theory in contract law, or equity. For the purposes of this Agreement, "direct costs, losses, or damages" shall not include any cost, expense, loss, award or damage suffered or incurred by a Party in respect of any actions, proceedings, claims, or demands made against that Party by any of its customers or any other Person.

ETC argues that the first sentence of this clause allows for the recovery of lost profits as direct damages. XTO disagrees, claiming that the second sentence does not distinguish between direct or indirect lost profit damages and, therefore, bars *any* such damages. ETC points to this court's opinion in *Continental Holdings, Ltd. v. Leahy*, which also interpreted a limitation of liability provision. *See* 132 S.W.3d 471, 475 (Tex. App.—Eastland 2003, no pet.). In *Continental Holdings*, the relevant clause provided that: "Neither [party] shall bear any liability to the other for loss of production, loss of profits, loss of business or any other indirect or consequential damages." *Id.* ETC seems to argue that, because *Continental Holdings* acknowledged that lost profit damages may be classified as "direct" or "indirect" damages, a no limitation of liability clause could waive both forms of lost profit damages. *See id.* But our conclusion in *Continental Holdings* does not support this assertion.

Here, the parties contemplated the recovery of "actual direct and foreseeable costs, losses, or damages caused by or resulting from the breach and incurred by the Party claiming damages." *Then*, the parties agreed per the terms of the contract that, "No Party shall be liable to any other Party *for any loss of profit or anticipated profit* . . . nor for any indirect loss, consequential loss, or exemplary damages

suffered." (emphasis added). Even with the limitation of liability clause language in *Continental Holdings*, which seemingly grouped loss of profits with indirect or consequential damages, we held that the plain, ordinary, and generally accepted meaning of the term "loss of profits" includes direct and indirect damages. *Continental Holdings*, 132 S.W.3d at 477. Here, the clause's language is even more distinct than it was in *Continental Holdings*. The permitted recovery of certain direct damages is identified first, and loss of profits (among other damages) is precluded. Using the plain meaning of "loss of profits," we conclude that the GPA's limitation of liability clause is unambiguous, and the parties have waived both direct and indirect loss of profit damages. ETC's second issue is overruled.

*Issue Three: Reliance Damages*

In ETC's third issue, it claims that the trial court abused its discretion when it foreclosed the recovery of reliance damages and excluded all of ETC's evidence that related to reliance damages. ETC claims that the untimely disclosure of evidence allegation only referred to a single spreadsheet and did not maintain that all claimed reliance damages evidence was untimely. XTO disagrees, claiming ETC did not timely disclose reliance damages and failed to establish an exception under Rule 193.6.

*Standard of Review and Applicable Law*

"A court of appeals reviews a trial court's decision under Rule 193.6(a) for abuse of discretion." *Jackson v. Takara*, 675 S.W.3d 1, 6 (Tex. 2023). In general, a trial court abuses its discretion if it acts arbitrarily, unreasonably, or without regard to any guiding rules and principles. *Galindo v. Prosperity Partners, Inc.*, 429 S.W.3d 690, 697 (Tex. App.—Eastland 2014, pet. denied) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)). This occurs when either (1) the trial court fails to analyze or apply the law correctly, or (2) with regard to factual issues and matters committed to its discretion, the trial court

15

can reasonably reach only one decision based on the record but failed to do so. *Mid Continent Lift & Equip., LLC v. J. McNeill Pilot Car Serv.*, 537 S.W.3d 660, 672 (Tex. App.—Austin 2017, no pet.).

A party who fails to timely make, amend, or supplement a discovery response may not introduce into evidence the material or information that was not timely disclosed unless the trial court finds that (1) there was good cause for the failure to timely provide the information or (2) the failure to timely provide the discovery response will not unfairly surprise or prejudice the other party. TEX. R. CIV. P. 193.6(a). The proponent of the evidence has the burden to establish a basis for allowing the introduction of the evidence or testimony, and the record must support a finding of good cause or lack of unfair surprise or prejudice. *Id.* R. 193.6(b).

The good cause exception allows a trial court to excuse a party's failure to comply with a discovery deadline in difficult or impossible circumstances. *PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 718 (Tex. App.—Dallas 2011, pet. denied). Inadvertence, lack of surprise, or the uniqueness of the offered evidence alone will not constitute good cause. *See id.*

To determine if the untimely discovery would unfairly surprise or prejudice the other party, we consider the purpose of Rule 193.6. *See Mid Continent*, 537 S.W.3d at 672 (collecting cases). The purpose of Rule 193.6 is to: (1) promote responsible assessment of settlement, (2) prevent trial by ambush, and (3) give the other party the opportunity to prepare rebuttal to expert testimony. *See In re D.W.G.K.*, 558 S.W.3d 671, 680 (Tex. App.—Texarkana 2018, pet. denied). Accordingly, to establish the absence of unfair surprise or prejudice, the party seeking to offer the testimony of an untimely-disclosed witness or to introduce untimely-disclosed evidence must establish that the other party had enough evidence

16

to reasonably assess settlement, to avoid trial by ambush, and to prepare rebuttal to expert testimony. *Id.*

*Analysis*

ETC characterizes XTO's argument about the untimely-disclosure-of-damages evidence as "a single spreadsheet." ETC claims this spreadsheet was nothing more than a supplement following a discovered inaccuracy. However, ETC admits on appeal that the supplemental spreadsheet was produced on June 24, 2022. Unless otherwise ordered, pretrial disclosures are typically timely if made at least thirty days before trial. *See* TEX. R. CIV. P. 194.4(b). Although June 24 is more than thirty days before the August 2022 trial setting, a Rule 11 agreement shows that the parties amended the factual discovery period to close on May 15, 2022. ETC does not contest this May deadline on appeal. As the disclosure on June 24 was untimely under the Rule 11 agreement, the burden was on ETC to show either good cause for the delay or that the delay would not cause unfair prejudice or unfair surprise. *See* TEX. R. CIV. P 193.6(b).

For good cause, ETC only claims that the supplemental spreadsheet was done "just weeks after discovering that an earlier version was inaccurate." This does not constitute either a difficult or an impossible circumstance. *See PopCap Games*, 350 S.W.3d at 718. Inadvertently providing an erroneous document in discovery alone does not constitute good cause. *Id.* Absent any other showing for delay, we conclude ETC has not met its burden under the good cause exception to Rule 193.6.

As for the second exception, ETC only claims that XTO had plenty of time before trial to review the document and it was a routine supplementation; therefore, XTO did not suffer any unfair prejudice. Considering the purposes of Rule 193.6, we conclude that inaccurate information, provided in an amended disclosure in an untimely manner, does not allow for the promotion of a responsible assessment of settlement or the proper preparation of rebuttal expert testimony. *See D.W.G.K.*, 558

17

S.W.3d at 680. ETC has failed to provide support in the record that it meets either purpose—that good cause exists or that the untimely produced discovery would not cause unfair prejudice or unfair surprise to XTO. We further note that this argument from ETC is their only argument for the lack of unfair surprise or unfair prejudice exception on appeal. Because this exception must be supported by evidence in the record, this bare statement alone is insufficient to meet their burden under Rule 193.6. *See* TEX. R. CIV. P 193.6(b). We decline to scour the record for Appellant to search for additional proof to satisfy their burden under the rule.

Accordingly, we conclude that the trial court did not abuse its discretion when it excluded the complained-of evidence. This holding, however, does not preclude the trial court from reconsidering and establishing new discovery deadlines on remand, should such action be deemed necessary, for future pretrial proceedings. ETC's third issue is overruled.

### *Issue Four: Equitable Relief*

ETC's fourth issue relates to the trial court's denial of ETC's request for specific performance—an equitable remedy. Because we are remanding the case to the trial court for further proceedings, we cannot say that no remedy at law is available at this juncture. *See Lauret v Meritage Homes of Tex., LLC*, 455 S.W.3d 695, 700 (Tex. App.—Austin 2014, no pet.) (A party seeing an equitable remedy— such as specific performance—must prove that legal remedies would not adequately compensate for the injuries suffered.); *Am. Hous. Res., Inc. v. Slaughter*, 597 S.W.2d 13, 15 (Tex. App.—Dallas 1980, writ ref'd n.r.e.) ("A fundamental rule of equity is that a court will not grant specific performance unless it is shown that no adequate remedy exists at law."). Here, ETC cannot prove that there is no legal remedy for the alleged injuries it suffered, as the trial court has not yet considered the validity of the complaints alleged in their pleadings. Further, we have clarified what damages ETC may seek under the parties' contractual limitation of liability clause—

18

if such damages are determined to be appropriate on remand. If such damages are not available, we will not preclude the trial court's consideration of available equitable relief, if any. As a result, we overrule ETC's fourth issue.

*This Court's Ruling*

We reverse the judgment of the trial court to the extent that it found the Dedicated Acreage map was unenforceable *in toto* under the statute of frauds, and to the extent that the trial court's judgment ordered Appellant (ETC) take nothing on its claims for breach of contract, fraud in the inducement, fraud and string along fraud, negligent misrepresentation, unjust enrichment, and quantum meruit. In all other aspects, we affirm the judgment of the trial court. We remand this case to the trial court for further proceedings consistent with this opinion.

W. BRUCE WILLIAMS
JUSTICE

September 12, 2024

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.