Opinion filed August 21, 2025



In The

# Eleventh Court of Appeals

_____

## No. 11-23-00207-CV
_____

**THE THAGARD MINERAL PARTNERSHIP, LP, Appellant**

**V.**

**MICHAEL L. CASS ET AL., Appellees**

_____

**-- and --**

_____

## No. 11-23-00208-CV
_____

**MICHAEL L. CASS, Appellant**

**V.**

**RIM LLLP (F/K/A RIM LLC AND RIM LLP) ET AL., Appellees**

**O P I N I O N**

The above are permissive appeals[1] from the trial court's grant of two partial summary judgments in favor of Appellees, Michael L. Cass; RIM LLLP; Richard O. Williams, individually and as manager/trustee of the WTX Royalty Trust; Mark C. Solari; TSH I LP; Penwell Company, LLC; Dee Bentley, Inc.; Blackbear Oil and Gas, LLC; and DAC Interests, LLC. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(d) (West Supp. 2024). The relief requested in Appellees' motions for summary judgment stem from a quiet title action concerning the ownership of certain overriding royalty interests (ORRI). Central to these appeals is our construction of two assignments that pertain to those ORRI and other property interests, which various parties dispute.

In its order that permitted the parties to seek interlocutory review of its summary judgment rulings, with regard to these assignments, the trial court identified two controlling questions of law for which there is substantial ground for difference of opinion and further stated that an immediate appeal from its order would materially advance the ultimate disposition of the litigation. *Id.* They are:

- Whether the first assignment (the Thagard Assignment) between Greg Thagard, the predecessor-in-interest to Appellant, The Thagard Mineral Partnership, LP,[2] and Michael L. Cass, an Appellee in Cause No. 11-23-00207-CV and the Appellant in Cause No. 11-23-00208-CV, is

---

[1]Although two separate appeals were filed, they arise from the same trial court cause number and the controlling questions of law are interrelated.

[2]For ease of reference, we will refer to both Greg Thagard and The Thagard Mineral Partnership as "Thagard."

unambiguous and unambiguously transferred to Cass all right, title, and interest, including ORRI, that Thagard owned in the subject property.

- Whether the second assignment, between Cass and Plains Petroleum Operating Company—the predecessor-in-interest to Appellees, RIM LLLP, Richard O. Williams, individually and as manager/trustee of the WTX Royalty Trust, Mark C. Solari, TSH I LP, Penwell Company, LLC, Dee Bentley, Inc., Blackbear Oil and Gas, LLC, and DAC Interests, LLC—unambiguously transferred Cass's entire mineral fee interest in all depths in the same property.

In ruling on both questions, the trial court found in the affirmative. Thagard appeals the trial court's first ruling and challenges (1) whether the Thagard Assignment is unambiguous, as the trial court found, and (2) if so, whether it transferred any of Thagard's royalty or leasehold interests to Cass. Cass appeals the trial court's second ruling and contends that the trial court erred when it determined that the second assignment unambiguously transferred Cass's entire mineral fee interest in all depths in the subject property. We affirm.

## I. *Factual Background*

This ownership dispute originated from a series of assignments made in 1990. First, Cass assigned ORRI to Thagard in the properties that are the subject of this dispute, namely, Sections 32 and 41 of Block 38, Township 4 South, Texas & Pacific Railway Company Survey, in Midland County. Next, on July 5, 1990, but dated effective "as of first runs of the leases," Thagard executed an assignment (the Thagard Assignment) that conveyed to Cass "all of [Thagard's] right, title, and interest in and to the lands, tracts, oil and gas and/or mineral leases and leasehold interests in and to the subject lands, which are listed and to the extent described on Exhibit 'A,' which is attached hereto and made a part hereof for all purposes (the 'Oil and Gas Properties')." The attached Exhibit A is reproduced below:

Subject to that certain Assignment, Bill of Sale and Conveyance dated July 5th, 1990, by and between Greg Thagard, Assignor, and Michael L. Cass, Assignee.

1.) Section 30, Block 38, T-4-S, T&P Ry. Co. Survey, Midland County, Texas

2.) Section 32, Block 38, T-4-S, T&P Ry. Co. Survey, Midland County, Texas

3.) Section 41, Block 38,T-4-S, T&P Ry. Co. Survey, Midland County, Texas

In an affidavit filed in the underlying suit, Thagard asserted that these transactions were a part of an ongoing, verbal agreement between himself and Cass wherein Thagard would acquire mineral leases on properties that he would thereafter assign to Cass in exchange for an ORRI in those properties. To Thagard's understanding, the Thagard Assignment was a curative measure that was intended to facilitate the transaction between Cass and Plains Petroleum, not to convey Thagard's ORRI to Cass.

Thagard further stated that, after the Thagard Assignment was executed but before the closing between Cass and Plains Petroleum, Thagard (1) "enter[ed] into stipulations of interest regarding the [ORRI] as part of the closing with Cass," and (2) "signed division orders" with another oil company, and those "division orders were never cancelled or changed due to the Assignments the subject of this suit." Since that time, Thagard also executed division orders with several other companies, including XTO, which showed his ownership of the ORRI at issue, and that he continued to receive ORRI payments from XTO until it decided to suspend these payments because of the issues that gave rise to this suit.

Shortly after the Thagard Assignment was executed, Cass executed an assignment that conveyed to Plains Petroleum certain interests that he owned,

4

including those in Sections 32 and 41. In relevant part, the granting clause of this assignment provided that the interests conveyed were those "owned by Assignors and listed on Exhibit 'A.'" Exhibit A, which is attached to this assignment, described the assigned interests in two parts. First, it provided a table that lists and identifies "Proved Developed Producing Properties." Noted above this table is an underlined and fully capitalized label, which states, "<u>MICHAEL L. CASS' PERSONAL INTEREST INCLUDING HIS O.R.R.I. & MINERAL INTEREST</u>." Sections 32 and 41 are included in this table, which is reproduced below:

Proved Developed Producing Properties

MICHAEL L. CASS' PERSONAL INTEREST INCLUDING HIS O.R.R.I. & MINERAL INTEREST

| LEASE NAME | W.I. | N.R.I. | SEC. | BLK. | TWP |
|---|---|---|---|---|---|
| Babb "30" | 75.0% | 61.1882% BPO 59.6829% APO | 30 - All | 38 | 4-S |
| Babb "30" #9D | 75.0% | | 30 - All | 38 | 4-S |
| A.M. Cowden | 55.6% | 44.4167% | 14 - E/2 NE/4 | 39 | 4-S |
| Cowden "28" | 55.6% | 45.9167% | 28 - S/2 SE/4 | 39 | 4-S |
| Cowden "32" #1 | 100.0% | 79.7500% | 32 - SE/4 | 39 | 4-S |
| Cowden "32" #2 | 100.0% | 79.7500% | 32 - SE/4 | 39 | 4-S |
| Cowden "40" | 75.0% | 59.0000% | 40 - N/2+SW/4 | 39 | 4-S |
| Cowden 40-1 | 75.0% | 55.5000% | 40 - N/2+SW/4 | 39 | 4-S |
| Cowden "46" #3 | 75.0% | 59.0000% | 46 - NE/4 E/2 | 39 | 4-S |
| Maralo "32" | 75.0% | 57.3567% BPO 56.6537% APO | 32 - All | 38 | 4-S |
| Maralo "32" #9 | 75.0% | | 32 - All | 38 | 4-S |
| Maralo "41" | 75.0% | 57.2501% BPO 57.0775% APO | 41 - All | 38 | 4-S |
| Midkiff "38" #1 & #2 | 75.0% | 59.7766% | 38 - SW/4 | 39 | 4-S |
| Midkiff "38" #3 & #4 | 75.0% | 57.6884% | 38 - NE/4 | 39 | 4-S |
| Wilson "39" #3 | 75.0% | 67.6733% | 39 - All | 39 | 4-S |
| Wilson "39" #1D,2D,4D | 75.0% | 67.6733% | 39 - All | 39 | 4-S |

Following this table in Exhibit A, is a centered heading entitled "Leases Covering The Above Producing Properties" that introduces a long list of properties—here, each property is listed and identified by the same "LEASE NAME" provided in the table, but under each property there is included an indented column that lists and identifies multiple leases by lessor, lessee, the date of the lease,

5

and the recording volume and page number.  Sections 32 and 41 are described in this second part of Exhibit A as follows:

> H.  Maralo "32" – Covering All of Section 32, Block 38, T-4-S, T&P Ry. Co. Survey, Midland County, Texas from the surface to 8700 feet subsurface.

[Followed by an indented column listing twenty-four leases]

> I.  Maralo "41" – Covering All of Section 41, Block 38, T-4-S, T&P Ry. Co. Survey, Midland County, Texas from the surface to 8700 feet subsurface.

[Followed by an indented column listing twenty-nine leases]

In 2018, XTO suspended ORRI payments to Thagard for Sections 32 and 41. Thagard alleges that XTO later suspended payments for ORRI for property outside of these sections as well, in an effort to recoup the alleged overpayments from Sections 32 and 41.  As a result, Thagard filed suit against Cass and XTO and sought declaratory and equitable relief, including to quiet title to the subject ORRI, damages from XTO, attorney's fees from Cass and XTO, and costs.

In response, Cass and XTO answered and each asserted counterclaims against Thagard for money had and received based on the allegation that Thagard had wrongly received ORRI payments over the preceding years.  Cass also asserted cross-claims against XTO for breach of contract, conversion, fraud, and trespass based on the alleged wrongful royalty payments that XTO made to Thagard and its failure to pay Cass profits that were attributable to certain working interests associated with depths in these sections below 8,700 feet.

In 2020, several other parties—the remaining Appellees in these appeals, whom we will refer to as the RIM parties—intervened in the underlying case.  The RIM parties alleged that they were owners of certain mineral and royalty interests in Sections 32 and 41 that Cass had allegedly conveyed to Plains Petroleum, the

predecessor-in-interest to the RIM parties, including interests in depths below 8,700 feet that Cass claimed to still own.

Both title disputes, between (1) Thagard and Cass, and (2) Cass and the RIM parties, were resolved by the trial court's grants of partial summary judgment in favor of Cass (Cause No. 11-23-00207-CV) and the RIM parties (Cause No. 11-23-00208-CV). As to the first dispute, the trial court determined that the Thagard Assignment unambiguously conveyed all of Thagard's property interests in the subject sections to Cass, including all ORRI. For the second dispute, the trial court initially determined that the assignment from Cass to Plains Petroleum conveyed all of Cass's right, title, and interest in Sections 32 and 41, except as to depths below 8,700 feet, which he purportedly retained. However, after considering the RIM parties' motion for reconsideration, the trial court vacated its prior order in part and determined that the operative assignment conveyed Cass's entire mineral fee interest in Sections 32 and 41, including those to all depths below 8,700 feet.

The trial court later signed an amended order, which incorporated its prior rulings on the two title issues and included the findings necessary to satisfy the statutory requirements for permitting the parties to seek permissive appeals of those title issue determinations.[3] *See* CIV. PRAC. & REM. § 51.014(d). Thagard thereafter filed a petition for permissive appeal of the title issue that pertains to its dispute with Cass and XTO, which we granted.[4] Cass separately filed a petition for permissive

---

[3]Specifically, the trial court found that the two title issues were "controlling questions of law . . . as to which there are substantial grounds for differences of opinion" and that "an immediate appeal . . . as to [those] issues will materially advance the ultimate termination of this litigation because it would dispositively resolve legal issues concerning the scope, meaning, and what interests, if any, were transferred as a result of the two assignments central to this matter." CIV. PRAC. & REM. § 51.014(d).

[4]XTO filed a letter brief in this appeal disclaiming any position on either title dispute.

appeal of the title issue that pertains to his dispute with the RIM parties, which we also granted.

## II. *Standard of Review*

We review declaratory judgment determinations under the same standards as other judgments. CIV. PRAC. & REM. § 37.010 (West 2020). "We look to the procedure used to resolve the issue below to determine the standard of review on appeal." *Tanglewood Homes Ass'n, Inc. v. Feldman*, 436 S.W.3d 48, 65–66 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Here, the trial court granted declaratory relief to Cass and the RIM parties in its orders granting their respective motions for summary judgment.

"We review a trial court's grant of summary judgment de novo." *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 705 (Tex. 2021); *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 837 (Tex. 2018). To prevail under the traditional summary judgment standard, the movant has the burden to establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *ConocoPhillips Co. v. Koopman*, 547 S.W.3d 858, 865 (Tex. 2018). If the movant meets its summary judgment burden, the burden then shifts to the nonmovant to present to the trial court any issues or evidence that would preclude the grant of summary judgment. *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014).

To determine if a genuine issue of material fact exists, we review the evidence in the light most favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 181 (Tex. 2019). We credit favorable inference to the nonmovant if reasonable jurors could do so, and we disregard contrary evidence unless reasonable jurors could not. *Samson Expl., LLC v. T.S.*

*Reed Props., Inc.*, 521 S.W.3d 766, 774 (Tex. 2017); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). The evidence raises a genuine issue of material fact if reasonable and fair-minded jurors could differ in their conclusions in light of all the summary judgment evidence presented. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

### III. *Applicable Law*

#### A. *Principles of Contract Construction*

When construing a contract, our objective is to "ascertain the true intentions of the parties as expressed in the writing itself," beginning with the instrument's express language. *Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 689 (Tex. 2022) (quoting *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011)); *see Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 743–44 (Tex. 2020). In doing so, we consider the entire writing and attempt to harmonize the provisions so that all are given effect, and none are rendered meaningless. *U.S. Polyco, Inc. v. Tex. Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 390 (Tex. 2023); *Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005).

Whether a contract is ambiguous is a question of law. *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018). "A contract is a written expression of the parties' intent. When that intent is in question, the text must be read 'as a whole in light of the circumstances [that existed] when the contract was executed.'" *Bd. of Regents of Univ. of Tex. Sys. v. IDEXX Laboratories, Inc.*, 691 S.W.3d 438, 439 (Tex. 2024) (quoting *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)). If a contract has a certain and definite meaning, the contract is unambiguous, and we will construe it as a matter of law. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019). Thus, when

9

a contract is unambiguous, it will be enforced as written—that is, the instrument alone will be deemed to express the objective intent of the parties, and extrinsic evidence bearing on the parties' subjective intent will not be considered. *See U.S. Polyco*, 681 S.W.3d at 387; *Devon Energy Prod. Co. v. Sheppard*, 668 S.W.3d 332, 343 (Tex. 2023). However, if a contract "is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent." *Barrow-Shaver*, 590 S.W.3d at 479; *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

When construing an unambiguous instrument, we may consult facts and circumstances surrounding its execution to aid our interpretation. *See Rustic Nat. Res. LLC v. DE Midland III LLC*, 669 S.W.3d 494, 501 (Tex. App.—Eastland 2022, pet. denied) (citing *Barrow-Shaver*, 590 S.W.3d at 483–84). However, we cannot employ the surrounding context to make contract language state something it unambiguously does not or to determine "that the parties probably meant, or could have meant, something other than what their agreement stated." *URI*, 543 S.W.3d at 757 (quoting *Anglo-Dutch Petrol. Int'l, Inc. v. Greenburg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011)). Rather, the "facts and circumstances can only provide context that elucidates the meaning of the words employed, and nothing else," and they can only give contract language a meaning to which it is "reasonably susceptible." *Id.* at 765. "In other words, such evidence may not be 'used to add, alter, or change the contract's agreed-to terms.'" *Nettye Engler Energy*, 639 S.W.3d at 690 (quoting *Barrow-Shaver*, 590 S.W.3d at 485); *see URI*, 543 S.W.3d at 758.

"Property 'excepted' or 'reserved' under an instrument of conveyance is 'never included in the grant' and is 'something to be deducted from the thing granted, narrowing and limiting what would otherwise pass by the general words of the

grant.'"[5]  *Graham v. Prochaska*, 429 S.W.3d 650, 655 (Tex. App.—San Antonio 2013, pet. denied) (quoting *King v. First Nat'l Bank of Wichita Falls*, 192 S.W.2d 260, 262 (Tex. 1946)).  Therefore, reservations must be made by clear language, and courts do not favor reservations by implication.  *Sharp v. Fowler*, 252 S.W.2d 153, 154 (Tex. 1952).  "Exceptions must identify, with reasonable certainty, the property to be excepted from the larger conveyance."  *Graham*, 429 S.W.3d at 655–56 (internal quotation marks omitted).  Thus, "[a]s a general rule, exceptions are strictly construed against the grantor."  *State v. Dunn*, 574 S.W.2d 821, 824 (Tex. App.—Amarillo 1978, writ ref'd n.r.e.).

If an instrument is expressly made "subject to" or "pursuant to" a second instrument, "the parties intended [them] to be construed together."  *Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 208 (Tex 2019); *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000).

B.  *The Statute of Frauds*

The statute of frauds requires that contracts for the sale of real property be in writing and signed by the party to be charged.  TEX. BUS. & COM. CODE ANN. § 26.01(a), (b)(4) (West 2023); *see also* TEX. PROP. CODE ANN. § 5.021 (West 2021).  Oil and gas interests constitute real property; therefore, an agreement for the transfer or assignment of a mineral interest must comply with the statute of frauds.  *Long Trusts v. Griffin*, 222 S.W.3d 412, 416 (Tex. 2006).  "[O]ne of the most essential elements of a contract for the conveyance of . . . an [ORRI] is a description of the lease from which it comes; for it is the lease which denotes the life and breadth of the estate to be assigned."  *Piranha Partners*, 596 S.W.3d at 742 n.2 (quoting

---

[5]Although sometimes used interchangeably, the terms "exception" and "reservation" carry separate meanings. *Perryman v. Spartan Tex. Six Cap. Partners, Ltd.*, 546 S.W.3d 110, 119 (Tex. 2018) ("Although an 'exception' can refer to any 'mere exclusion from the grant,' a 'reservation' must 'always be in favor of and for the benefit of the grantor.'" (quoting *Pich v. Lankford*, 302 S.W.2d 645, 650 (Tex. 1957))).

*Gruss v. Cummins*, 329 S.W.2d 496, 501 (Tex. App.—El Paso 1959, writ ref'd n.r.e.)).

The sufficiency of a legal description in any instrument that transfers a property interest is a question of law that we review de novo. *Anderson Energy Corp. v. Dominion Okla. Tex. Expl. & Prod., Inc.*, 469 S.W.3d 280, 295 (Tex. App.—San Antonio 2015, no pet.) (citing *Dixon v. Amoco Prod. Co.*, 150 S.W.3d 191, 194 (Tex. App.—Tyler 2004, pet. denied)).

To comply with the statute of frauds, an instrument must provide sufficient information to reasonably identify the property in question, either directly or "by reference to some other existing writing" by which the property to be conveyed may be identified with "reasonable certainty." *Davis v. Mueller*, 528 S.W.3d 97, 101 (Tex. 2017) (quoting *Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex. 1972)). Even if the record is clear that the parties knew and understood what property was to be conveyed, the knowledge and intent of the parties will not make the contract valid. *Morrow*, 477 S.W.2d at 540. Thus, if the contract does not sufficiently describe the real property interest to be conveyed, the conveyance is void under the statute of frauds and will not support an action for specific performance or breach of contract. *Pick v. Bartel*, 659 S.W.2d 636, 637 (Tex. 1983); *Wilson v. Fisher*, 188 S.W.2d 150, 152 (Tex. 1945).

"The purpose of the written description is not to identify the land, but to provide a *means* of identification." *Anderson Energy*, 469 S.W.3d at 295 (citing *Reiland v. Patrick Thomas Props., Inc.*, 213 S.W.3d 431, 437 (Tex. App.—Houston [1st Dist.] 2006, pet. denied)). The Texas Supreme Court has acknowledged that Texas employs a strict application of the statute of frauds for interests in land, but it nonetheless allows for a liberal construction of the words that describe the land. *See Gates v. Asher*, 280 S.W.2d 247, 248 (Tex. 1955). The property description must

furnish enough information to locate the property's general area "as in identifying it by tract survey and county," and to determine the "size, shape, and boundaries" of the property. *Anderson Energy*, 469 S.W.3d at 295 (quoting *Reiland*, 213 S.W.3d at 437); *see Morrow*, 477 S.W.2d at 539. The description of real property "must be reasonably certain so that a party familiar with the locality could identify the property to the exclusion of other property." *Gary & Theresa Poenisch Fam. Ltd. P'ship v. TMH Land Servs., Inc.*, No. 04-20-00300-CV, 2021 WL 4173309, at *3 (Tex. App.—San Antonio Sept. 15, 2021, pet. denied) (mem. op.) (citing *Gaut v. Daniel*, 293 S.W.3d 764, 767 (Tex. App.—San Antonio 2009, pet. denied)).

"When the language in the contract furnishes a 'key or nucleus' description of the property, extrinsic evidence may then be used merely as an aid to identify the property with reasonable certainty from the data contained in the contract, not to supply a missing description." *Anderson Energy*, 469 S.W.3d at 295–96 (citing *Long Trusts*, 222 S.W.3d at 416). Under this "nucleus description" theory, a property description may identify the property "with reasonable certainty when: (1) the contract contains a 'statement of ownership' such as 'my property,' 'my land,' or 'owned by me;' and (2) it is shown by extrinsic evidence that the party to be charged owns only one tract of land [or only one interest in real property] fitting the property description in the contract." *Moudy v. Manning*, 82 S.W.3d 726, 728 (Tex. App.—San Antonio 2002, pet. denied) (quoting *Pickett v. Bishop*, 223 S.W.2d 222, 223 (Tex. 1949)); *see Williams v. Ellison*, 493 S.W.2d 734, 736 (Tex. 1973).

Nevertheless, if the instrument of conveyance "refers to another instrument which contains a proper description of the property, such [] instrument may be looked to in aid of the description." *ConocoPhillips Co. v. Hahn*, 704 S.W.3d 515, 533 (Tex. 2024) (quoting *Maupin v. Chaney*, 163 S.W.2d 380, 383 (Tex. 1942)). "Thus, it is sufficient if the instrument 'furnish[es] within itself *or by reference to*

*other identified writings then in existence*, the means or data by which the particular land [or interest in land] to be conveyed may be identified with specific certainty.'" *Id.* (quoting *Pick*, 659 S.W.2d at 637).

IV.  *Analysis*

A.  *Cause No. 11-23-00207-CV – The Thagard Assignment Is Unambiguous and Unambiguously Conveyed the Subject Interests*

Thagard contends that the Thagard Assignment is facially incomplete for two reasons: (1) it repeatedly refers to leases listed on Exhibit A, but no leases are listed in Exhibit A, which is a material omission because (a) the effective date of the assignment is tied to the leases, (b) the Thagard Assignment discusses appurtenant rights in reference to the leases in Exhibit A, and (c) the interests conveyed are those interests "*to the extent described*" in Exhibit A; and (2) the Thagard Assignment purports to be "subject to" a missing instrument.  Thagard argues that either of these flaws renders the Thagard Assignment ambiguous and incapable of interpretation as a matter of law; therefore, the use of extrinsic evidence to complete the contract terms is justified.

Thagard further contends that even if the assignment is both complete and effective, it nevertheless failed to convey any ORRI because the statute of frauds requires a conveyance of such interests to identify the associated leases, which the Thagard Assignment fails to do.

Cass responds that the Thagard Assignment is unambiguous because the only reasonable interpretation of it is that Thagard conveyed to Cass all his interests in Sections 32 and 41.  Cass contends that Thagard's ambiguity arguments fail for the same reasons his statute-of-frauds argument fails: the scope of the conveyance and its effective date can be determined as a matter of law by reviewing and considering the four corners of the Thagard Assignment and readily available public data.  Cass

14

also responds that no missing instrument exists because the "subject to" phrase in Exhibit A of the Thagard Assignment refers to the Thagard Assignment itself.

The parties' arguments primarily concern whether the leases associated with the contested royalty interests must have been attached to the Thagard Assignment for it to be unambiguous. In this regard, we will first address Thagard's argument that the scope of this Assignment is limited by a missing instrument.

Thagard bases this argument on the following sentence in Exhibit A: "Subject to that certain Assignment, Bill of Sale and Conveyance dated July 5th, 1990, by and between Greg Thagard, Assignor, and Michael L. Cass, Assignee." Thagard urges that this sentence refers to an additional assignment between Thagard and Cass, which serves to limit the description in Exhibit A of the Thagard Assignment. Thagard contends that this additional assignment is a necessary part of the Thagard Assignment's interpretation, it is not in the summary judgment record, and, as such, it is missing; therefore, the Thagard Assignment cannot be given a matter-of-law interpretation.

Importantly, the Thagard Assignment—between Thagard as Assignor and Cass as Assignee—is entitled "Assignment, Bill of Sale and Conveyance," and dated July 5, 1990. Thagard acknowledges this, but reasons that it is nonsensical for a property description (Exhibit A) to describe itself as "subject to" the operative conveyance—rather, properly, it is the *conveyance* that is subject to the property description, which defines the scope of the conveyance. This is true enough.

However, Thagard concedes in an affidavit that he has "looked for but been unable to locate the missing assignment." In his affidavit, Cass states that (1) he is unaware of the existence of the alleged additional assignment, (2) only one assignment matching the description in Exhibit A was executed between he and Thagard, and (3) the allegation that an additional assignment that limited the grant

15

in the Thagard Assignment is not an accurate representation. Cass also states in his affidavit that, "After I executed and sent the Thagard Assignment to Mr. Thagard for recording, he recorded the Thagard Assignment in the Deed Records of Midland County, Texas. . . . The Alleged Assignment, which was alleged of having been executed on or about the same date, was not recorded, for the simple reason that it does not exist."

Thagard asserts that it is as reasonable to conclude from these circumstances that there is a missing document here, as it is to conclude that the parties used language that was both circular and backwards. We disagree; there is no evidence that another assignment exists. Thus, lacking another reasonable explanation, the inartful "[s]ubject to" language in Exhibit A appears to refer to the Thagard Assignment itself.

Next, we address Thagard's remaining arguments regarding the property description in Exhibit A and the text of the assignment that refers to the "leases listed" there. Because this analysis requires an examination of the scope of the property description in Exhibit A, with it we also address Thagard's statute-of-frauds argument.

Thagard argues that the language that refers to the "leases listed" in Exhibit A renders the Thagard Assignment incomplete and ambiguous because no leases are listed in Exhibit A. But the granting language of the Assignment does not use this language. Instead, the grant in the Thagard Assignment conveys "all of [Thagard's] right, title, and interest in and to the lands, tracts, oil and gas and/or mineral leases and leasehold interests in and to the subject lands, which are listed and to the extent described on Exhibit 'A.'" Thagard contends that this language is narrowed by the property description in Exhibit A because the granting clause limits the grant to the property "listed and to the extent described" in Exhibit A. According to Thagard,

16

Exhibit A describes only the surface estate because although the granting language described various interests, it was limited by the "listed and to the extent described on Exhibit A" language. Thus, such a description of the sections of land only is tantamount to a limitation of the grant because a specific description of leases or other interests was not included.

It is true, as Thagard argues, that "where an exhibit is referenced to describe the property being conveyed, it is the description of the interest in the *exhibit* which controls the scope of the grant, regardless of the breadth of the granting language." *Posse Energy, Ltd. v. Parsley Energy, LP*, 632 S.W.3d 677, 693 (Tex. App.—El Paso 2021, pet. denied) (citing *Piranha Partners*, 596 S.W.3d at 747–48). However, it is also true that an instrument of conveyance of real property passes whatever interest the grantor has in the land, unless it contains language expressing the intention to grant a lesser estate. *Rahlek, Ltd. v. Wells*, 587 S.W.3d 57, 64 (Tex. App.—Eastland 2019, pet. denied). As the Texas Supreme Court has said, "[a]ll means all." *Davis*, 528 S.W.3d at 102.

Thus, in proper context, the description of the interest in the *exhibit* (here Exhibit A) is controlling, regardless of the breadth of the granting language. *Posse Energy*, 632 S.W.3d at 693 (citing *Piranha Partners*, 596 S.W.3d at 747–48). But this only begins the inquiry because an exhibit that does not expressly state whether the interest listed in it identifies the scope of the interest that was conveyed presents further interpretive questions. *See Vaughn v. Vaughan*, 710 S.W.3d 412, 420 (Tex. App.—Eastland 2025, pet. denied) (citing *Occidental Permian, Ltd. v. Citation 2002 Inv. LLC*, 689 S.W.3d 899, 905 (Tex. 2024)). In *Occidental Permian*, the final granting clause included a broad statement that it was the intent of the parties to the assignment to convey "all rights and interests . . . regardless of whether same may be incorrectly described or omitted from Exhibit A," however, more specific or

limiting descriptions in the Exhibit A do not act to limit the grant. *Id.* at 419–20 (quoting *Occidental Permian*, 689 S.W.3d at 902–03, 906); *see also Piranha Partners*, 596 S.W.3d at 746.

We addressed a similar question to the one now before us in *Vaughn*. *See Vaughn*, 710 S.W.3d at 415. In *Vaughn*, a deed of trust over certain real property referenced an exhibit to describe the property being conveyed. *Id.* The exhibit described the property as:

SURFACE ESTATE ONLY:

Being all of the Southeast One-fourth (SE/4) of Section Eight (8), Block Thirty-two (32), Township G North, T&P Ry. Co. Surveys, Borden County, Texas.

SUBJECT TO THE FOLLOWING EXCEPTIONS AND/OR RESERVATIONS:

(a)     All outstanding ownership in the oil, gas[,] and other minerals in, on[,] and under that may be produced from the described premises, as such outstanding interest are shown by the records of the County Clerk of Borden County, Texas;

(b)     Any outstanding oil, gas[,] and mineral lease or leases upon the premises, which lease or leases appear of record in the office of the County Clerk of Borden County, Texas; and

(c)     Any and all easements and/or rights-of-way which appear of record in the office of the County Clerk of Borden County, Texas, or which are visible and apparent upon the ground.

*Id.* at 415–16. In *Vaughn*, we considered whether the deed of trust secured a lien on mineral interests as well as the surface estate of the property. *Id.* at 415. We concluded that it did not because the exhibit attached to the deed of trust expressly and unambiguously limited the conveyance to the surface estate only and excepted all mineral interests. *Id.* at 420–21.

18

Here, Exhibit A contains no language that limits the grant to the surface estate only, nor does it contain any exceptions from the grant whatsoever. As such, it does not at all narrow or limit the broad granting language contained in the Thagard Assignment. *See Rahlek*, 587 S.W.3d at 64 ("[A] deed will pass whatever interest the grantor has in the land, unless it contains language showing a clear intention to grant a lesser estate."); *Graham*, 429 S.W.3d at 655–56 ("Exceptions 'must identify, with reasonable certainty, the property to be excepted from the larger conveyance.'" (quoting *Angell v. Bailey*, 225 S.W.3d 834, 840 (Tex. App.—El Paso 2007, no pet.)); *see also Davis*, 528 S.W.3d at 102 ("All means all.").

Thagard contends that any conveyance of an ORRI requires a description of the lease that it burdens. *See Piranha Partners*, 596 S.W.3d at 742 n.2; *Gruss*, 329 S.W.2d at 501. But as Cass points out, both *Piranha Partners* and *Gruss* involved conveyances of an ORRI *only*, whereas the Thagard Assignment involves a grant of "*all*" the assignor's right, title, and interest in the lands, tracts, leases, and leasehold interests in and to the subject lands as described on Exhibit A, which simply describes three sections of land. Nevertheless, a broad grant such as this need not be so specific to be effective. *See Rahlek*, 587 S.W.3d at 64; *see also Davis*, 528 S.W.3d at 102.

With this understanding of the scope of the property description, we turn to the "leases listed" language that Thagard points out in other provisions of the Assignment. The first reference appears in the following language:

> This Assignment includes, to the extent Assignor may lawfully assign same, corresponding undivided interests in and to *all* of such Assignor's right, title, interest and estate in and to the property and rights incident, not limited to the leases listed on Exhibit "A" (emphasis added).

19

This boilerplate provision can be harmonized with the broader language in the grant and the broad property description. *Occidental Permian*, 689 S.W.3d at 905–09; *U.S. Polyco*, 681 S.W.3d at 390; *Frost Nat'l Bank*, 165 S.W.3d at 312. It contemplates that leases *may* be listed in Exhibit A, but as we have explained, the granting language and corresponding property description broadly encompass *all* of Thagard's interests, including any leases. Contrary to Thagard's assertion, the above passage does not conflict with this reading or create any ambiguity.

Next, the effective date of the Thagard Assignment is tied to the "first runs" of the "leases listed" in Exhibit A. The term "first runs" is not defined and the effective date appears to be a condition precedent, for which an exception to the parol evidence rule exists. *Rincones v. Windberg*, 705 S.W.2d 846, 847 (Tex. App.—Austin 1986, no pet.) ("It is settled that parol evidence of a condition precedent to a contract is admissible. The effect of such a condition 'is not to vary the terms of a binding instrument, but merely, as a condition precedent, to postpone the effective date of the instrument until the happening of a contingency." (quoting *Baker v. Baker*, 183 S.W.2d 724, 728 (Tex. 1944))).

Cass cites to three Texas cases in which the term "first runs" is used in reference to oil and gas leases;[6] however, none of these cases offer more than an implied definition of the term, nor does Cass cite to any other authority to support his contention that it is a common term in the oil and gas industry. Thagard does not challenge the meaning of this term; instead, he asserts that because leases are not

---

[6]*Tex. Gas Corp. v. Hankamer*, 326 S.W.2d 944, 946 (Tex. App.—Houston 1959, writ ref'd n.r.e.) ("A test run shall be made at the time such well is put on stream and first runs are made into the pipe line."); *Tiller v. Fields*, 301 S.W.2d 185, 187 (Tex. App.—Texarkana 1957, no writ) ("This well is now, and has continuously since the date of first runs in 1952, produced gas in commercial quantities."); *Rainwater v. Mason*, 283 S.W.2d 435, 437 (Tex. App.—Amarillo 1955, no writ) (deed conveying "royalties due or to become due from the day of first runs" entitled the appellee to royalties "from the accrued oil runs").

explicitly listed in Exhibit A, this omission renders the Assignment incomplete or the effectiveness date impossible. We disagree. Even if the leases *were* included in Exhibit A, they could not furnish the timing of the "first runs" from the four corners of the assignment. It is necessarily a future contingency. *See id.*

Therefore, we return to the question of whether the property description that is contained in Exhibit A is sufficient because it provides the information needed to locate the land—we conclude that it is. Moreover, this information subsequently would allow one to locate the interests that are associated with the grant of this assignment, including the leases and pertinent Railroad Commission information, which would furnish the first production dates of the leases.

For the reasons discussed above, we conclude that the Thagard Assignment is unambiguous and unambiguously transferred to Cass *all* right, title, and interest, including ORRI,[7] that Thagard had in the subject property. As such, the trial court did not err when it granted partial summary judgment in favor of Cass on this issue. Accordingly, we overrule Thagard's issues on appeal.

B. *Cause No. 11-23-00208-CV – The Assignment from Cass to the RIM Parties Unambiguously Conveyed Cass's Entire Mineral Fee Interest in Sections 32 and 41*

We turn now to the second dispute, between Cass, as Appellant,[8] and the RIM parties. The controlling question of law is whether the second assignment, between

---

[7]The RIM parties filed a brief in Cause No. 11-23-00207-CV and adopted Cass's arguments, but additionally argued that the Thagard Assignment conveyed the royalty interests in Section 41 granted by Cass to Thagard through a "royalty deed" dated January 4, 1990, which Cass then conveyed to the RIM parties in the assignment between them that is the subject of Cause No. 11-23-00208-CV, which we discuss below. The trial court's order—which we affirm in this opinion—broadly declared that the Thagard Assignment conveyed "all" of Thagard's right, title, and interest to Cass. Similarly, our construction of the Thagard Assignment includes "all" right, title, and interest that Thagard held in Sections 32 and 41.

[8]The Assignors to this assignment included Cass, his wife, and "MLC Co., Inc., and Michael L. Cass Companys, Inc. dba MLC Co., Inc." We refer to this group as "Cass" unless otherwise specified, but

21

Cass and Plains Petroleum, unambiguously transferred Cass's entire mineral fee interest in all depths in the subject property.

Cass contends that the assignment and the descriptions listed in Exhibit A to this assignment are unambiguous and clearly limit the conveyance to only the depths described. The RIM parties argue that the assignment conveyed "all" of Cass's personal right, title, and interest in the mineral fee interest—including the attendant royalty interests—in Sections 32 and 41 without any limitation as to depths.

Shortly after the Thagard Assignment was executed, Cass executed an assignment that conveyed certain interests to Plains Petroleum. As relevant to the disputed mineral interests, the assignment's granting clause provided the following:

> For Ten Dollars ($10.00) and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, Assignors have granted, bargained, sold, conveyed, assigned, transferred, set over and delivered and do hereby grant, bargain, sell, convey, assign, transfer, set over and deliver unto Assignee as of the Effective Date all of Assignor's right, title and interest in and to the following described estates or interests (herein collectively called the "Properties"), to-wit:
>
> (a) all of the oil, gas, and other mineral leases, properties, rights and undivided interests owned by Assignors and listed on Exhibit "A" attached hereto and incorporated herein, but not limited to all leasehold, mineral, royalty, non-participating royalty and overriding royalty interests, net profits interests, production payments, other payments out of or pursuant to production of hydrocarbons and other rights, including contractual rights to production, and contractual rights providing for the acquisition or earning of any such interests related thereto; and

That is, it recited that Cass conveyed "*all*" of his right, title, and interest in "the following described estates or interests, to-wit:" all of the oil, gas, and mineral leases, properties, rights, and undivided interests owned by Cass and listed in Exhibit A.

Exhibit A begins with a statement that it is attached to and made a part of the assignment dated July 24, 1990, "by and between Michael L. Cass, et al and Plains

importantly, the mineral interest at issue is or was Michael L. Cass's *personal* interest in the subject lands, as discussed in detail below.

Petroleum." It then states that "All Properties are located in Midland County, Texas." After these preliminaries, there is a table of "Proved Developed Producing Properties." Above the table, capitalized and underlined, is the label "MICHAEL L. CASS' PERSONAL INTEREST INCLUDING HIS O.R.R.I. & MINERAL INTEREST." Sections 32 and 41 are included in this table, which is reproduced below:

Proved Developed Producing Properties

MICHAEL L. CASS' PERSONAL INTEREST INCLUDING HIS O.R.R.I. & MINERAL INTEREST

| LEASE NAME | W.I. | N.R.I. | SEC. | BLK. | TWP |
|---|---|---|---|---|---|
| Babb "30" | 75.0% | 61.1882% BPO 59.6829% APO | 30 - All | 38 | 4-S |
| Babb "30" #9D | 75.0% | | 30 - All | 38 | 4-S |
| A.M. Cowden | 55.6% | 44.4167% | 14 - E/2 NE/4 | 39 | 4-S |
| Cowden "28" | 55.6% | 45.9167% | 28 - S/2 SE/4 | 39 | 4-S |
| Cowden "32" #1 | 100.0% | 79.7500% | 32 - SE/4 | 39 | 4-S |
| Cowden "32" #2 | 100.0% | 79.7500% | 32 - SE/4 | 39 | 4-S |
| Cowden "40" | 75.0% | 59.0000% | 40 - N/2+SW/4 | 39 | 4-S |
| Cowden 40-1 | 75.0% | 55.5000% | 40 - N/2+SW/4 | 39 | 4-S |
| Cowden "46" #3 | 75.0% | 59.0000% | 46 - NE/4 E/2 | 39 | 4-S |
| Maralo "32" | 75.0% | 57.3567% BPO 56.6537% APO | 32 - All | 38 | 4-S |
| Maralo "32" #9 | 75.0% | | 32 - All | 38 | 4-S |
| Maralo "41" | 75.0% | 57.2501% BPO 57.0775% APO | 41 - All | 38 | 4-S |
| Midkiff "38" #1 & #2 | 75.0% | 59.7766% | 38 - SW/4 | 39 | 4-S |
| Midkiff "38" #3 & #4 | 75.0% | 57.6884% | 38 - NE/4 | 39 | 4-S |
| Wilson "39" #3 | 75.0% | 67.6733% | 39 - All | 39 | 4-S |
| Wilson "39" #1D,2D,4D | 75.0% | 67.6733% | 39 - All | 39 | 4-S |

Following this table in Exhibit A, a centered heading entitled "Leases Covering The Above Producing Properties" introduces a long list of properties—each producing property is listed again, but under each producing property is included an indented column that lists and identifies the leases by lessor, lessee, the date of the lease, and the recording volume and page number. Sections 32 and 41 are described in this part of Exhibit A as follows:

23

H.    Maralo "32" – Covering All of Section 32, Block 38, T-4-S, T&P Ry. Co. Survey, Midland County, Texas from the surface to 8700 feet subsurface.

[Followed by an indented column listing twenty-four leases]

I.    Maralo "41" – Covering All of Section 41, Block 38, T-4-S, T&P Ry. Co. Survey, Midland County, Texas from the surface to 8700 feet subsurface.

[Followed by an indented column listing twenty-nine leases]

The grant concludes in the body of the assignment with a habendum clause, which reads: "TO HAVE AND TO HOLD the Properties, to the extent herein conveyed."

Cass argues that, when read together, the table of "Producing Properties" and the following list of leases that covers them provide the full description of the properties identified in Exhibit A and conveyed in Section I (a) of the assignment. Conversely, the RIM parties argue that the depth limitations in the "Leases Covering" section apply only to the leases listed and identified there, and not to the mineral interests included in the table of "Producing Properties." We agree with the RIM parties.

As we stated earlier, because the granting language references and incorporates Exhibit A to describe the property being conveyed in Section I (a), the description of the property in the *exhibit* controls the scope of the grant over the breadth of the granting language. *Posse Energy*, 632 S.W.3d at 693 (citing *Piranha Partners*, 596 S.W.3d at 747–48). But when such an exhibit contains ambiguities, we will read all the provisions of the instrument together to ascertain its meaning. *See Occidental Permian*, 689 S.W.3d at 905–06 (holding that all provisions should be read and construed together to determine whether any ambiguity exists) (citing *Piranha Partners*, 596 S.W.3d at 752–53).

Here, the six-column table of "Proved Developed Producing Properties" is preceded by the underlined and all-capitalized label: "MICHAEL L. CASS' PERSONAL INTEREST INCLUDING HIS O.R.R.I. & MINERAL INTEREST." The table shows various interest percentages, each associated with a "LEASE NAME" and a corresponding section number, block number, and township. The column showing each section number also specifies whether the table covers "all" of the section number or only a fractional part. For example, the "Maralo 41" covers "all" of Section 41, whereas the "A.M. Cowden" covers only the East half of the Northeast quarter of Section 14. The table does not contain any notations regarding depth limitations. This is significant.

The next section is introduced by the header "Leases Covering The Above Producing Properties." This list again lays out the same properties listed in the "LEASE NAME" column of the "Producing Properties" table but here, rather than in tabular form, the property information is simply spelled out. For example, the "LEASE NAME" for the first property listed the "Producing Properties" table is "Babb '30'," the section number is "30 – All," and the block number is "38." In the "Leases Covering" section, the first property is identified as "Babb – Covering All of Section 30, Block 38, T-4-S, T&P Ry. Co. Survey, Midland County, Texas containing 664.3 acres of land, more or less." The descriptions of the two properties that are the subject of this dispute are set out above.

The parties do not dispute that the properties identified in both parts of Exhibit A are the same; however, they disagree as to the meaning of this designation. Although the same properties are listed in both parts of Exhibit A, only one part— the "Leases Covering" section—at times mentions or refers to depth limitations. The RIM parties contend that the depth limitations noted in the "Leases Covering" section do not apply to the descriptions in the "Producing Properties" table because

that table compiles Michael L. Cass's personal interests in those properties that are to be conveyed, including mineral and royalty interests, rather than the specific leases that cover the same property.

Cass contends that the "Leases Covering" section more clearly and specifically identifies the property. According to Cass, everything that is used to identify the property in the "Leases Covering" section—including the depth limitations that are present in the descriptions of Section 32, Section 41, and others—applies equally to all the property that is described in the "Producing Properties" table. Cass essentially asserts that because the "Producing Properties" are listed in their table by "LEASE NAME(s)" that correspond(s) to the properties listed in the "Leases Covering" section, the "LEASE NAME" column simply incorporates all the following section's information, including depth limitations, into the "Producing Properties" table.

But the headers and labels included in the two sections of Exhibit A indicate that they address different aspects of the conveyance. The "Producing Properties" table unambiguously labels and identifies Cass's personal interests, including his mineral interests. The "Leases Covering" section does not mention or refer to Cass's personal interests, whether it be working interests, royalty interests, overriding royalty interests, or mineral interests. Instead, it only addresses the leases that cover the "Producing Properties." The two sections of Exhibit A are segregated by headers and labels that indicate different subjects, but each use the "Lease Name(s)" of the properties—"Babb [Section Number]" or "Maralo [Section Number]," for example. However, one section contains and refers to depth limitations; the other does not. Because there is no express guidance in the exhibit that directs us to read the two sections one way or the other, we must turn to the provisions of the assignment. *See*

*Occidental Permian*, 689 S.W.3d at 905–06 (citing *Piranha Partners*, 596 S.W.3d at 752–53).

Because of the minor ambiguities in Exhibit A, the breadth of the granting language in Section I weighs in favor of a broader reading of the assignment. The pertinent language indicates an intent to convey everything that the Assignors—Cass, his wife, and his companies—own in the "Properties," and that this would be better effectuated by refusing to construe the depth limitations in one part of Exhibit A into another part that does not expressly contain such limitations.

Greater support for this view is contained in Section IV of the assignment, which sheds further light on the meaning of Exhibit A:

> **IV.**
>
> The decimal interest set forth in Exhibit "A" in connection with certain of the Properties therein described (which decimal interests may be variously referred to as "Working Interest", "Net Revenue Interest", and "Overriding Royalty Interest", or other words of like import) are set forth for informational purposes only, and are in no wise intended, nor shall they be construed, to enhance or diminish the scope or effect of this conveyance; it being the intent hereof that the entire right, title and interest in and to the Properties owned by Assignors and described on Exhibit "A" as of the Effective Date hereof shall be subject to the terms of this Assignment, Conveyance and Bill of Sale.

This section further supports our reading that (1) Exhibit A is designed to contain two separate parts which address two separate topics, and (2) the "Producing Properties" table should not be associated with the depth limitations contained in the "Leases Covering" section. Section IV expressly disclaims that the decimals set forth in Exhibit A—regarding certain identified properties that describe various working interests, net revenue interests, ORRI, "or other words of like import"—are limitations on the scope of the grant, and it states that they are for informational purposes only. Immediately following this, Section IV also states that it is the parties' intent that "the entire right, title and interest in and to the Properties owned by Assignors and described on Exhibit 'A' as of the Effective Date hereof shall be

subject to the terms of this Assignment." Section IV specifically addresses the only express limitation that is contained in the "Producing Properties" table—the decimal percentages of various interests as described in the second and third columns. Moreover, it does so to specifically disclaim them *as limitations*. Significantly, Section IV does not address depth limitations at all.

The *leases* "described on Exhibit A" are only mentioned once in the body of the assignment in Section V. There, the assignment is expressly made subject to "the terms and provisions of the oil and gas leases described on Exhibit 'A' and all assignments and/or agreements which affect said leases, whether or not the same appear of record." Nowhere does the assignment address the depth limitations contained in the "Leases Covering" section of Exhibit A.[9]

This silence is telling. Although the assignment takes care to prohibit the construction of the percentages that are expressed as decimals in Exhibit A as being limitations on the grant—because the intent is to assign the "entire right, title and interest" owned by Assignors and described in Exhibit A—it does not prohibit such a construction of the depth limitations. And yet the depth limitations are not included in the "Producing Properties" table—which is clearly labeled as addressing a different subject than what is contained in the "Leases Covering" section, and in which the only potential limitation that *is* included is expressly disclaimed as "for informational purposes only."

Cass cites to several cases in support of his primary contention that a plain reading of Exhibit A shows an intent to limit the grant in accordance with the depth

---

[9]As a practical observation, the inclusion of a list of existing leases within the four corners of a property conveyance that includes mineral interests advises the purchaser of the property of the existing burdens than run with and are associated with that property. In that scenario, chosen language that the property acquired is "subject to" existing leases would indicate that the acquired property shall be assumed with any existing lease that burdens the property.

limitations contained in the "Leases Covering" portion of Exhibit A. We find each case to be distinguishable.

In *Posse Energy*, the instrument limited that grant to a lease "INSOFAR AND ONLY INSOFAR AS" the lease covered certain depths. *Posse Energy*, 632 S.W.3d at 681, 685. But *Posse Energy* concerned a single lease with a specific depth limitation, and the Eighth Court of Appeals noted that the Texas Supreme Court held in *Piranha Partners* that the phrase "INSOFAR AND ONLY INSOFAR" serves as a limitation on the conveyance itself. *Id.* at 694 (citing *Piranha Partners*, 596 S.W.3d at 753). The court in *Posse Energy* also distinguished the conveyance instruments it was construing from those in *Piranha Partners* and similar cases because, unlike those cases, the instruments and exhibits in *Posse Energy* contained sufficient specificity to dictate the scope of the grant. *Id.* at 694–95. Here, the assignment did not contain any specific limitation, and the Assignors conveyed a variety of property interests, including some labeled in Exhibit A's "Producing Properties" table as "<u>MICHAEL CASS' PERSONAL INTEREST INCLUDING HIS O.R.R.I. & MINERAL INTEREST</u>."

Cass next cites to our decision in *Large v. T. Mayfield, Inc.* because there the granting clause described the grant as: "Being all the Surface Rights, and everything thereon," which we construed to be a limitation of the grant to only the surface rights. 646 S.W.2d 292, 293–94 (Tex. App.—Eastland 1983, writ ref'd n.r.e.). In the case now before us, however, the grant in Section I (a) simply references Exhibit A for property-description purposes only—there is no limitation in the granting language that is similar to that which we construed in *Large*.

Next, Cass cites to *Ridgefield Permian*, in which a Sherrif's Deed was limited by reference to the interests foreclosed in a tax suit and that were described in an order of sale and in an exhibit. *Ridgefield Permian, LLC v. Diamondback E & P*

*LLC*, 626 S.W.3d 357, 369 (Tex. App.—El Paso 2021, pet. denied). There, the Eighth Court of Appeals reasoned that despite the broad language in the granting clause, the language was limited by references to "as foreclosed" in the tax suit and "as described in the Order of Sale," and to an exhibit attached to the "Sheriff's Deed." *Id.* Because only a certain specific interest fit those limitations, despite the broad granting language, the scope of the grant was significantly limited. *Id.* We do not disagree with the court's analysis in that case. Nevertheless, it differs from the case now before us because here, the question is not whether the reference in the granting clause to Exhibit A limited the scope—it does—but rather *how* the descriptions contained in Exhibit A did so. As we have explained, the structure of Exhibit A and the emphatic labeling of the "Producing Properties" table that pertains specifically to the certain interests in dispute dictates our interpretation of its effect.

Cass also cites to other cases, including *Piranha Partners*, which he claims each stand for the same proposition as those cited above. *See Piranha Partners*, 596 S.W.3d at 744, 753; *Hansaker v. Brown Distrib. Co., Ltd.*, 373 S.W.3d 153, 158 (Tex. App.—San Antonio 2012, pet. denied) (grantor conveyed one-half of what he owned, rather than one-half of the listed mineral interests because the attached exhibit described only property "now owned by" grantor); *Dupnik v. Hermis*, No. 04-12-00417-CV, 2013 WL 979199, at *5 (Tex. App.—San Antonio Mar. 13, 2013, pet. denied) (mem. op.) ("surface only" language included in the property description in the attached exhibit was a limitation on the grant); *Elder v. Anadarko E & P Co.*, No. 12-10-00250-CV, 2011 WL 2713817, at *4 (Tex. App.—Tyler July 13, 2011, no. pet.) (mem. op.) (legal descriptions in attached exhibit controlled over language in the granting clause). We give the same explanation for each— although we have followed the interpretive principles espoused in the cases cited and relied on by Cass, none of them present analogous circumstances. As we have

30

said, because of the minor ambiguities contained in *this* attached exhibit, we have consulted both the language of the controlling exhibit (Exhibit A) *and* the provisions in the body of the assignment, and our reading of this assignment and this exhibit, when taken together as a whole, supports the conclusion that we reach today. *See Occidental Permian*, 689 S.W.3d at 905–09.

We conclude that because (1) Exhibit A contains minor ambiguities, (2) the granting language throughout the assignment is very broad, (3) Exhibit A is segregated into two parts and labeled for different purposes, and (4) the first part of Exhibit A does not contain express depth limitations but does include decimal percentages that are disclaimed as for "informational purposes only," the depth limitations in the second part of Exhibit A cannot be read to apply to the properties that are described in the table in the first part of Exhibit A, as Cass suggests. Therefore, by its terms, the assignment conveyed *all* of Cass's personal interests in the mineral fee—including the attendant royalty interests—in Sections 32 and 41, to *all* depths. As such, the trial court did not err when it granted summary judgment in favor of the RIM parties on this issue. Accordingly, we overrule Cass's sole issue.

## V. *This Court's Ruling*

We affirm the orders of the trial court.

W. STACY TROTTER
JUSTICE

August 21, 2025

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.